FIRST FLIGHT ASSOCIATES, INC.
and Robert G. Wynn, Plaintiffs-Appellants, Cross-Appellees,

v.

PROFESSIONAL GOLF COMPANY,
INC. and John M. Tucker, Defendants-Appellees, Cross-Appellants.

Nos. 75–1489 and 75–1490.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 13, 1975.

Decided Dec. 23, 1975.

William M. Hill, San Diego, Cal., James P. Anderson, Jr., Thrasher, Sherrill & Anderson, Chattanooga, Tenn., for plaintiffs-appellants, cross-appellees.

Thomas A. Caldwell, Jr., Stophel, Caldwell & Heggie, William H. Horton, Charles J. Gearhiser, Gearhiser, Carpenter & Peters, Chattanooga, Tenn., for defendants-appellees, cross-appellants.

Before PHILLIPS, Chief Judge, LIVELY, Circuit Judge, and MARKEY, Chief Judge, U. S. Court of Customs and Patent Appeals.*

MARKEY, Chief Judge, U. S. Court of Customs and Patent Appeals.

These cross appeals arise out of diversity actions and counterclaims which followed termination of the relationship between Professional Golf Company (Pro Golf) a manufacturer of golf equipment, and First Flight Associates, Inc. (FFA), its foreign sales representative and trademark licensee. FFA sued for commissions earned as sales representative, for damages resulting from an alleged breach of contract, trade libel and inducement to breach of contract by Pro Golf. The counterclaims of Pro Golf sought damages resulting from alleged breach of duty by FFA under its trademark license. The district court awarded FFA its earned commissions and dismissed the remainder of the complaint and the counterclaims. We affirm.

### Background

Pro Golf is based in the United States and engaged in the manufacture and marketing of golf equipment under the trademark FIRST FLIGHT, which has been registered in the United States and certain foreign countries. In 1961 Robert G. Wynn (Wynn) became the Far East sales representative for FIRST FLIGHT golf clubs and balls. Wynn established FFA under Japanese law and conducted his affairs as Pro Golf's sales representative under the FFA corporate name.

* Sitting by designation.

The relationship between FFA and Pro Golf was informal and was never memorialized in a formal contract. An exchange of letters evidenced that relationship and the rather casual approach of the parties to the understanding and agreement between them. With respect to the Japanese civilian market and golf equipment (clubs and balls), a 1970 letter from Pro Golf to Wynn stated:

First, we do agree that you will continue to have the exclusive right to import and promote the sale of First Flight golf equipment in the Japan civilian market, however, this is not an irrevocable right but would remain in effect only so long as you did a satisfactory business in this market.

During the period of 1966–67 the parties entered into a second, equally informal agreement, which was in law a trademark license. That agreement permitted FFA to use Pro Golf's FIRST FLIGHT trademark on golf "soft goods" made by or for FFA and sold by FFA in the Far East. The term "soft goods" encompassed golf bags, headcovers, gloves, shirts, caps, sweaters, windbreakers, and the like. In a letter of June 7, 1967, Pro Golf's president referred to the trademark license as follows:

Now as to the royalty agreement, for exclusive permission to use First Flight's name on other golf products, our Executive Committee has agreed to accept your suggestion as to the first year's royalty to be a flat $2,500.00 to cover the period November 1, 1966, through October 31, 1967. *One half* to be paid now, the balance to be paid at the end of the year. The second and third year of this agreement should be on a continuing $2,500.00 minimum basis with a 4% royalty to apply against the minimum. It is my intention to come to Japan in September or October and will work out the details with you at that time.

On August 4, 1967, Wynn paid the semi-annual royalty, stating "the second and third year of this agreement should also be on a continuing $2,500 guarantee basis." FFA continued to pay the annual royalty, in semi-annual payments, for about five years, the last such payment being for the six months prior to May 1, 1972.

In Japan, FFA had used subdistributors to promote sales of its own "soft goods" under the trademark FIRST FLIGHT. In a 1972 distribution agreement, FFA sub-licensed Teito Company, Ltd., to use the FIRST FLIGHT trademark on golf "soft goods" sold by Teito. For that sub-license, Teito was to pay to FFA an annual royalty in the amount of $25,000.

After the Teito agreement was reached, a dispute arose between Pro Golf and FFA concerning the terms of the trademark license agreement between them. Attempts to negotiate more definite terms failed, but investigations conducted during and as a result of the negotiations disclosed that Pro Golf's registrations of FIRST FLIGHT in Japan, for use on "soft goods," were incomplete. Third parties had obtained registrations of FIRST FLIGHT in Japan, entitling them to use the mark on goods in other classes of goods established under Japanese law. Those classes included sports clothing and sport bags. Pro Golf's trademark difficulties and the trademark license dispute with FFA apparently led to deterioration of the sales representation relationship between the parties. Indeed, the briefs before us have not fully recognized the legal distinctions between the two different agreements entered into by the parties.[1]

Wynn refused to disclose to Teito the absence of total trademark control in Japan, though Pro Golf had instructed him to do so. Wynn also rejected Pro Golf's

---

1. For example, Pro Golf refers to Wynn as an "employee" and to his "discharge" in discussing the activities of FFA and Wynn under both agreements. Whether Wynn's sales representation activities were conducted under an employment contract or as an independent contractor is irrelevant to his or FFA's right to earned commissions and to Pro Golf's right to terminate the sales representation relationship. Under the trademark license, Wynn/FFA was clearly a licensee, i. e., an independent contractor.

repeated requests for details of the FFA-Teito sub-license, particularly the amount of Teito's royalty obligation to FFA. On February 16, 1973, John M. Tucker, Pro Golf's president, wrote Teito stating that neither Pro Golf nor FFA owned the Japanese rights for FIRST FLIGHT as applied to "sportswear or golf bags and related items." Tucker also stated that no royalty payment made by Teito to FFA was being received by Pro Golf and that Wynn was not an agent of Pro Golf authorized to execute contracts on its behalf.

Tucker's letter produced additional friction between Pro Golf and FFA. Finally, on March 6, 1973, Wynn was notified that he and FFA were being terminated as sales representatives for Pro Golf clubs and balls and that orders submitted for such equipment after July 1973 would not be accepted.

### Proceedings Below

Under the sales representation agreement with Pro Golf, FFA claimed a commission on orders for clubs and balls placed with Pro Golf prior to the March 6, 1973, termination date. Pro Golf took the position that no commission was due because it was its custom not to pay commissions until shipments were made. The district court, finding that the record failed to support the existence of the alleged custom, determined that commissions were earned on the date approved orders were submitted to Pro Golf. Whether actual payment may have been made after shipment did not influence determination, in the court's view, of the date on which the commission was earned.

FFA sought damages for breach by Pro Golf of the sales representation agreement. The district court characterized the agreement as "in effect one ter-minable at the will of either party." Led by the parties to an apparent intertwining of the two agreements, the court further observed that the conduct of FFA under its trademark license, including refusal to follow Pro Golf's instructions, amounted to "unsatisfactory business" and provided Pro Golf good cause for termination of the sales representation agreement.

On the basis of Pro Golf's contacts with Teito, which *inter alia* disclosed the third party ownership of Japanese registrations of FIRST FLIGHT, FFA alleged slander of title and trade libel. The court below found Pro Golf's statements to be "essentially true" and also that the communication was privileged in the "protection of legitimate business interests." FFA also alleged that such contacts constituted an unlawful inducement to breach of contract, in violation of Tenn. Code Ann. § 47–15–113.[2] The district court found no violation of the statute, because FFA failed to show that its trademark sub-license contract with Teito had been terminated or breached and because the express terms of the FFA-Teito contract permitted its termination upon termination of the Pro Golf-FFA underlying trademark license contract. The court held that failure of the parties to negotiate renewal of the Pro Golf-FFA trademark license and the failure of FFA to pay royalties to Pro Golf for periods after May 1, 1972, evidenced the expiration of that license contract as of that date.

Pro Golf's counterclaims, for alleged losses resulting from fraud, misrepresentation, concealment, and self dealing by Wynn and FFA, had nothing to do with the sales representation relationship, but were grounded on FFA's sub-license to Teito at a royalty much larger than that paid to Pro Golf by FFA. Pro Golf also

---

**2.** 47–15–113. Procurement of breach of contracts unlawful—Treble damages.—It shall be unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of said contract; and the party injured by such breach may bring his suit for said breach and for such damages.

sought to recover its expenses in attempting to perfect its Japanese trademark rights for all golf "soft goods." Because the original license was silent regarding sub-licenses, the court found that FFA was within its rights in sub-licensing, for its own profit, the trademark rights licensed by Pro Golf. As to its expenses in seeking to perfect its trademark rights, the court held that because Pro Golf had itself failed to provide its trademark with adequate Japanese registration coverage, its subsequent expenditures were not caused by any actions of FFA.

### Issues

The issue on appeal is whether the district court erred in finding that (1) FFA was entitled to its earned commissions; (2) Pro Golf was entitled to terminate the sales representation contract; (3) Pro Golf was not liable for trade libel and interference with contract; and (4) FFA was not liable under the counterclaims for royalties received from Teito or for Pro Golf's expenditures relating to its trademark rights in Japan.

### OPINION

#### (1) Commissions

We agree with the district court's view that FFA was entitled to commissions on the orders placed, but not shipped, prior to contract termination. We further agree with the distinction drawn by the court between the time of earning and the time for payment of commissions. Pro Golf argues here, as it did below, that by course of conduct and custom, payment of commissions was required only upon shipment of the order and that its termination of the sales representation contract prior to shipment extinguished FFA's right to the commissions. We cannot agree.

Pro Golf's only evidence of its commission payment "custom" is the testimony of one of its directors, Louis W. Oehmig. The testimony indicated commissions had been "credited" when an order was shipped and that commissions on orders shipped after a salesman's discharge were not paid. There was no indication that the alleged custom was known or agreed to by Wynn/FFA, or that it was uniformly applied, or that it had been in continuance for any particular time period.

We find no error in the district court's conclusion that the evidence failed to establish the existence of a recognized and accepted custom with such certainty as to require its incorporation in the sales representation agreement. Nor was the district court's conclusion that FFA's commissions were *earned* on the date Pro Golf received the orders, obtained and forwarded by FFA, clearly erroneous. That enjoyment of some earned commissions of some salesmen may have been postponed until an order was shipped, cannot entitle Pro Golf, by its unilateral act of termination, to deprive FFA of its earned commissions.

#### (2) Pro Golf's Termination of the Sales Representation Contract

As to the initial 1961 contract for Japanese sales representation on clubs and balls, we agree with the district court that Pro Golf effectively and lawfully terminated FFA as its representative, the termination being effective as of the end of July 1973. That termination did not breach the contract. The above-quoted portion of one of the writings evidencing the contractual relationship of the parties establishes that the right conferred to import and promote the sale of FIRST FLIGHT golf equipment in Japan was "not an irrevocable right but would remain in effect only so long as you [Wynn/FFA] did (sic) a satisfactory business in this market." The contract was clearly therefore one for an indefinite period of time. Contracts silent on time of termination are generally terminable at will by either party with reasonable notice. *See* 1 Corbin on Contracts § 96. On March 6, 1973, Wynn was notified of Pro Golf's termination, effective at the end of July 1973. In view of the friction that had

developed between the parties, albeit in relation to another agreement, the five-month duration of the notice of termination was reasonable. It is unnecessary to discuss the conduct of Wynn or FFA under the trademark license contract or whether "satisfactory business" was being done under the sales representation contract. The latter contract being terminable at will, Pro Golf was clearly within its rights in terminating it.

### (3) Trade Libel and Inducement of Contract Breach

■ FFA alleges that the Tucker communications with Teito, advising it of trademark ownership deficiencies and Wynn's lack of authority to contractually bind Pro Golf, constitute trade libel or defamation, as well as an attempt to procure a breach of Teito's contract with FFA. On both those issues the court below found the evidence insufficient to sustain FFA's allegations. FFA has failed to demonstrate error in that finding and we can detect none. No evidence indicates that the communications were untrue or were made in bad faith or with malice. Indeed, an objective view of all of the relevant evidence favors the impression that the contacts with Teito were, in major part, an attempt to clarify the extent of Pro Golf's rights and activities in Japan. That such contacts may have been in the interests of Pro Golf is neither unexpected nor fatal to the conclusion that they were truthful and privileged efforts to protect a business interest and not trade libel or defamation.

■ Nor do we find error in the trial court's interpretation of the evidence as failing to disclose an unlawful interference with, or an inducement to breach, a contract in violation of Tenn.Code Ann. § 47–15–113. Because the statute provides for treble damages, a penal aspect, it is strictly construed. *Lichter v. Fulcher*, 22 Tenn.App. 670, 125 S.W.2d 501 (1938). Communication of Pro Golf's concern about its trademark rights in Japan to Teito, which may have had a business interest in the trademark, was not a violation of § 47–15–113. See *Swift v. Beaty*, 39 Tenn.App. 292, 282 S.W.2d 655 (1954). To succeed, FFA had the burden of establishing a breach by Teito and inducement thereof by Pro Golf. The district court found that the evidence failed to clearly show "when, how, or whether the contract between Teito and First Flight ever came to an end."

■ The district court's conclusion that the Pro Golf-FFA trademark license expired on May 1, 1972, was supported by substantial evidence and was not clearly erroneous. Although the terms of the agreement are far from clear, the evidence shows a history of semiannual royalty payments by FFA covering the five year period up to May 1, 1972. At about that time, in discussing new terms, FFA offered to increase the royalty payment to $5,000 annually. Pro Golf insisted on learning the terms of the FFA-Teito agreement, from which it could determine whether $5,000 was a reasonable royalty. FFA refused to disclose those terms and Pro Golf refused FFA's royalty offer. FFA made no royalty payment after the payment for the period ending May 1, 1972. The failed negotiations for a new agreement, and the discontinuance of royalty payments, support the district court's conclusion that the Pro Golf-FFA trademark license contract had expired as of May 1, 1972.

■ Because the underlying Pro Golf-FFA license contract expired on May 1, 1972, FFA had nothing thereafter with which to sub-license Teito. The district court could therefore have found concurrent termination of at least all relevant portions of the FFA-Teito sub-license with the May 1, 1972, termination of the Pro Golf-FFA license. In any event, the express language of the FFA-Teito sub-license contract permitted its termination without breach upon termination of the underlying Pro Golf-FFA license contract. The FFA-Teito sub-license contract was therefore either ended or terminable at will by Teito at any time subsequent to May 1, 1972. Tucker's letter was dated February 16, 1973. It and

Pro Golf's subsequent contacts with Teito could not, therefore, have been an inducement for Teito to unlawfully breach its contract.

#### (4) Counterclaims

■ Pro Golf contends that royalties paid to FFA by Teito should have been passed through to Pro Golf. That contention is based on Pro Golf's fundamentally unsound characterization of FFA as its agent in entering into the Teito contract. As we have indicated, that contract is a trademark sub-license, wherein FFA conveyed to Teito some or all of its rights to use FIRST FLIGHT in Japan as a trademark on "soft goods," which rights FFA had under its license from Pro Golf. Nothing in FFA's trademark license contract with Pro Golf prohibited FFA from granting sub-licenses to others or required FFA to pass along to Pro Golf any royalties FFA might receive from such sub-licenses.

■ Pro Golf also counterclaimed for damages equal to its expenditures incurred in attempting to perfect its Japanese rights in FIRST FLIGHT as applied to certain golf "soft goods." Pro Golf's difficulties stemmed from its own failure to obtain complete registration in Japan of FIRST FLIGHT in all of the relevant classes of goods. Under Japanese trademark law, rights are acquired through registration and not through use in commerce as in the United States.[3] Although Pro Golf had exclusive rights in FIRST FLIGHT when applied to clubs and balls and to some of the classes of "soft" goods on which the trademark was being used by FFA, third parties had obtained Japanese registrations of FIRST FLIGHT for use on other classes of goods, including other golf "soft goods." Pro Golf found it necessary to deal with those third party registrants in seeking to acquire exclusive rights in FIRST FLIGHT as a trademark in Japan for the entire spectrum of golf "soft goods." We fully agree with the district

court that FFA is not liable for expenditures "incurred by reason of Pro Golf's own failure to properly register its trademark in Japan."

Accordingly, the decision of the district court is in all respects affirmed.

3. For an interesting result of the conceptual difference in establishing trademark rights, see Hanabusa, *Various Problems Involved With* ■ *"Free Ride on Trademarks"* in Japan, 54 Trademark Reporter 906 (1964).