In the Matter of PENNSYLVANIA TIRE COMPANY, Debtor.

PENNSYLVANIA TIRE COMPANY,
Plaintiff,

v.

Dex Moore FIRESTONE, Dexter L.C. Moore and Jane M. Moore dba Dex Moore Firestone, Dexter L.C. Moore and Jane M. Moore, Defendants.

Bankruptcy No. 679–01333.
Adv. No. 680–0132.

United States Bankruptcy Court,
N.D. Ohio.

May 7, 1982.

Kenneth A. Torgerson, and Marc D. Flink, of Baker & Hostetler, Cleveland, Ohio for plaintiff.

Joseph F. Hutchinson, Jr., of Buckingham, Doolittle & Burroughs Co., L.P.A., Akron, Ohio for defendants.

JAMES H. WILLIAMS, Bankruptcy Judge.

Pennsylvania Tire Company (hereinafter Plaintiff or Pennsylvania) filed for relief under Chapter 11 of Title 11 of the United States Code on November 1, 1979, one month after its related companies, Mansfield Tire & Rubber Company (hereinafter Mansfield) and Pennsylvania Tire & Rubber Co. of Mississippi, Inc. (hereinafter Penn Miss) sought similar relief, also before this court. In broad terms, sufficient for understanding the relationship between the debtor companies so far as these proceedings are concerned, Plaintiff was the marketing arm for Mansfield and Penn Miss which were involved in the manufacture of tires and certain other products not herein relevant. As a part of the administration of this and the related Chapter 11 cases, Plaintiff caused an action to be filed against the above named defendants for the collection of accounts receivable. The Defendants responded with an answer, counterclaim and third party complaint, denying the allegations of Plaintiff's complaint, setting up the affirmative defenses of breach of contract, setoff, recoupment, breach of warranty and fraud. Additionally, Defendants raised a defense under 11 U.S.C. § 365 based on Plaintiff's inability to assume certain executory obligations and finally, by their counterclaim and third party complaint against Mansfield and Penn Miss, the Defendants demanded compensatory and punitive damages for breach of contract and fraud.

At the conclusion of the trial the parties submitted proposed findings of fact and arguments in support of their respective positions. The court finds the facts, established in support of Plaintiff's complaint, to be as follows:

1. Dex Moore Firestone Home and Auto Supply (hereinafter Dex Moore Firestone) is a sole proprietorship owned by Dexter Moore with stores located in the states of Massachusetts and Vermont. Wholesale and retail sales of tires comprise the bulk of the proprietorship business, and Dex Moore Firestone has marketed products sold to it by Plaintiff for approximately ten to twelve years prior to Plaintiff's filing for relief before this court.

2. No written distributorship agreement was in effect between Plaintiff and Dex Moore Firestone at any time relevant to this proceeding.

3. Dex Moore Firestone placed an order with Plaintiff in July of 1979 for $36,301.05 worth of snow tires, taking advantage of the "Early Bird Special" discount. offered by Plaintiff.

4. Dex Moore Firestone received the above tires in two shipments in September, 1979, the first on September 12th and the second on September 25th.

5. On or about October 1, 1979, Dexter Moore contacted Plaintiff's vice president of sales by telephone and learned that Plaintiff had terminated its operations and filed for relief in this court.

6. On October 11, 1979, after learning of Plaintiff's cessation of business, Dex Moore Firestone made a payment on its account with Plaintiff and submitted a note to Plaintiff from Dexter Moore, requesting the correction of an overbilling on the tires received in September, 1979. In that note, Dexter Moore urged resolution of the billing errors so that he could sell the tires in question. (Defendants' Exhibit 123)

7. Plaintiff's records, as attested to by its president, showed a past due balance of $11,771.15 on November 28, 1979, on which Plaintiff asserted an interest charge of $117.71. (Plaintiff's Exhibit G–6) At the end of December, 1979, the past due balance had increased to $23,989.21 and Plaintiff issued its invoice for $239.89 as additional interest. (Plaintiff's Exhibit G–5) Dex

Moore Firestone made no formal protest of the assessment of interest on its past due balance, despite the fact that such interest charges were contrary to prior practice. After October 15, 1979, no payments or credits were posted on Dex Moore Firestone's account with Plaintiff.

8. On February 13, 1980, Plaintiff's credit manager notified Dexter Moore that Plaintiff's records showed a past due account balance owing from Dex Moore Firestone in the amount of $36,859.42. Demand was made for said sum, less $2,000.00 which Plaintiff proposed that Dex Moore Firestone retain for future tire adjustments. (Plaintiff's Exhibit D–1)

9. The total balance due, according to Plaintiff's records, as of the date of trial, is $44,196.22, a figure which includes $7,895.17 as the net of credits issued and interest charged on the pre-petition indebtedness. (Plaintiff's Exhibits E–1 and G–1)

10. Plaintiff issued, on April 11, 1978, a detailed explanation of its limited warranty on passenger and light truck tires and its adjustment program for covered defects. (Plaintiff's Exhibit I 1–22) Distributors were warned to "read every bit of it * * *." (Plaintiff's Exhibit I–1)

11. On April 15, 1972, Defendants Dexter and Jane Moore executed an unlimited guaranty of the credit of Dex Moore Firestone and delivered same to Plaintiff. (Defendants' Exhibit C–1)

From the evidence of the Defendants adduced in support of their position, it is found that:

12. Plaintiff offered certain benefits to Defendant Dex Moore Firestone as a part of the distributorship arrangement between them:

a. *Price Protection*
In the event of a reduction in the value of the tires in the Defendant's inventory, Plaintiff would issue a credit for the difference between the old and new prices.

b. *Reimbursement for Handling*
Plaintiff would allow Defendant $3.00 for handling the adjustment of a bias ply tire and $5.00 for a radial tire adjustment.

c. *Re-aging Accounts*
Plaintiff would "re-age" accounts, i.e., credit Defendant's account for any large quantities of unsold tires (e.g., snow tires at the end of the winter driving season), allow Defendant to retain the merchandise and re-bill for it prior to the next season.

d. *Return Tire Privilege*
Odd-sized or slow selling tires could be returned for credit.

e. *Advertising Allowances*
Plaintiff provided certain advertising materials, such as decals, posters, newspaper "slicks," banners and flyers, or credits therefor, based upon sales.

f. Plaintiff would entertain and provide displays at national trade shows in order to stimulate sales.

13. As of October 1, 1979, Defendant Dex Moore Firestone had on hand 1,932 tires sold to it by Plaintiff, including those purchased under the terms of the above mentioned "Early Bird Special." The cost of this inventory was $55,969.03. Defendant sold 1,162 of these tires prior to the date of trial, leaving 770 of Plaintiff's tires in the inventory of Dex Moore Firestone.

14. From the date of the last settlement between the parties under Plaintiff's warranty and adjustment program (Plaintiff's Exhibit I) through February, 1981, Dex Moore Firestone had adjusted 321 tires.

15. Mansfield's Board of Directors met on September 6, 1979 and resolved to suspend tire production at the company's Tupelo, Mississippi plant. It was determined at said meeting that no public announcement of such action was required under Securities and Exchange Commission disclosure regulations when such announcement "would be injurious to the business and the interests of the shareholders." Such injury would be manifested, according to the minutes of said meeting, by the refusal of suppliers to deliver materials unless paid in full for outstanding bills and goods delivered; the withholding of payments of

accounts receivable; and by interfering in the effort to find a purchaser for the Tupelo property. (Defendants' Exhibit 119)

16. Defendant Dex Moore Firestone has been sued for freight charges of $443.06 on the September tire shipments received from Plaintiff and has incurred $130.00 in attorney fees in defense of said lawsuit, despite an agreement with Plaintiff that tires ordered in July of 1979 would be shipped freight prepaid.

## OPINION

At the outset of the court's examination into this matter, some clarification as to the status of the various parties defendant would appear to be in order. Plaintiff named as Defendants in this action Dex Moore Firestone, Dexter and Jane Moore doing business as Dex Moore Firestone, and Dexter and Jane Moore as individual guarantors of Dex Moore Firestone. From a perusal of the testimony and briefs before the court, it is uncontroverted that Dex Moore Firestone is the sole proprietorship of Dexter Moore, and it is further uncontroverted that Dexter and Jane Moore are guarantors of the obligations said proprietorship owes to Plaintiff.

For ease of reference, Parts I through VI of the ensuing discussion will be directed toward liabilities and defenses of Dex Moore Firestone and use of the term "Defendant" in those sections will refer to said proprietorship. In Part VII, the discussion will focus on the liability of Dexter and Jane Moore as guarantors, who will be designated as "Defendants" therein.

### I

Our effort to bring some order out of the plethora of issues and sub-issues raised by both parties in what commenced as a relatively straight-forward collection action starts with Plaintiff's right, if any, to be paid the contract price for the goods it sold and delivered to Defendant Dex Moore Firestone.

Chapter 1302 of the Revised Code of Ohio, tracking generally Article 2 of the Uniform Commercial Code, deals with sales. Section 1302.83 provides, in pertinent part:

(A) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under section 1302.84 of the Revised Code, the price:

(1) of goods accepted or of conforming goods lost or damaged within a commercially reasonable time after risk of their loss has passed to the buyer; * * *

The Official Comment to this section notes, in paragraphs two and five:

2. The action for the price is now generally limited to those cases where resale of the goods is impracticable except where the buyer has accepted the goods or where they have been destroyed after risk of loss has passed to the buyer.

　　*　　*　　*　　*　　*　　*

5. 'Goods accepted' by the buyer under division (A)(1) include only goods as to which there has been no justified revocation of acceptance, for such a revocation means that there has been a default by the seller which bars his rights under this section. 'Goods lost or damaged' are covered by the section on risk of loss. * *

■ Acceptance, Plaintiff argues, has taken place, thus invoking Section 1302.-64(A)(3), providing that:

(A) Acceptance of goods occurs when the buyer:

　　*　　*　　*　　*　　*　　*

(3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

There is no dispute as to Defendant's receipt of tires from Plaintiff which it then resold to wholesale and retail customers, (Defendants' Post Trial Brief, p. 2) and the court finds an acceptance from the actions of Defendant in offering the tires in question for resale.

Having concluded that an action for the price is appropriate, the court must next determine the amount Plaintiff is owed. Plaintiff's president testified to a balance

due on Defendant's account of $36,301.05, plus interest of $7,895.17 for a total of $44,196.22. Plaintiff's Exhibits E–1 and G–1 also reflect this total amount, which the court accepts as the balance due on account, subject to any defenses Defendant may establish.

Defendant vigorously objects to Plaintiff's effort to collect interest on the account, arguing, without challenge from Plaintiff, that, prior to 1979, no interest had been charged. Commencing with the balance owed on November 28, 1979, Plaintiff began to assess interest charges. The rate of interest charged began at 12% on an annual basis and escalated to an annual rate as high as 20%, with higher effective rates due to the monthly compounding of interest.

Plaintiff, tacitly admitting that the parties had not contracted for a rate of interest, denies Defendant's assertion that such assessment was made "in violation of law" and claims that, pursuant to Section 1302.11 of the Revised Code, the right to collect interest at the rates it asserted was established by the course of performance between the contracting parties.

■ While Defendant never objected formally to the assessment of interest at rates selected by Plaintiff, no payments were made on the account after Plaintiff began charging interest, and the court finds the conduct of the parties insufficient to ratify the rates of interest charged on a theory of course of performance. However, Plaintiff is entitled to an award of interest at statutory rates, being 6% from December 1, 1979 to July 30, 1980 and 8% thereafter, pursuant to Section 1343.03 of the Revised Code.

## II

Defendant argues that the benefits of the distributorship arrangement, described in Finding of Fact No. 12 above, are contractual covenants which are inextricably bound up in each purchase contract for tires and are therefore not terminable at Plaintiff's will. Accordingly, says Defendant, each purchase order involved the acquisition of tires *plus* future performance of various facets of the distributorship arrangement. Plaintiff maintains that the individual sales contracts and any benefits available under the distributorship arrangement are separate matters.

Indeed, Defendant's position regarding its *own* intent is undoubtedly correct; that is to say, Defendant did business with Plaintiff rather than some other manufacturer because of the benefits available under the arrangement, such as re-aging of accounts and the return tire privilege. The appropriate inquiry is whether each sales contract incorporates these benefits as rights in the form of a covenant.

Certainly, the record is devoid of any evidence of an express covenant between the parties, there being clear disagreement as to their intent and neither does the evidence support a finding of the existence of implied covenants through application of Section 1302.05 of the Revised Code.[1]

No evidence has been adduced which would supply a term of duration for the distributorship arrangement. Consequently, Plaintiff maintains, Section 1302.22 of the Revised Code, which in essence codifies prior case law in stating that a contract of indefinite duration may be terminated after a reasonable time by either party upon reasonable notification, is applicable. Section 1302.22 reads:

(A) The time for shipment or delivery or any other action under a contract if not provided in sections 1302.01 to 1302.-

---

1. Revised Code Section 1302.05(A) provides that the written expression of the agreement between contracting parties may be supplemented by the course of dealing between such parties, which is defined in Section 1301.11(A) to be "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." The unrefuted testimony of Plaintiff's vice president of marketing and sales was that available benefits were conferred on a case-by-case basis without reference to any standardized policy, and the court is unable to raise such a nebulous understanding to the level of an implied contractual covenant.

98, inclusive, of the Revised Code or agreed upon shall be a reasonable time.

(B) Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.

(C) Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable.

The relationship between these parties endured for more than ten years. (Finding of Fact No. 1) The imposition of a reasonable time requirement has been justified as follows:

> The reasonable period of existence permits the distributor to recover the additional fixed costs (e.g. capital expenditures) which have been incurred in reliance upon the distributorship agreement.

*Excello Wine Company v. Monsieur Henri Wines, Ltd.,* 474 F.Supp. 203, 208 (S.D.Ohio, 1979).

No evidence has been shown that Defendant, as a multi-product tire distributor, incurred significant capital outlays in marketing Plaintiff's products, but a ten year period would be reasonable in any event, as reasonableness is a question of fact. *See, e.g., Alpha Distributing Co. of California v. Jack Daniel Distillery,* 454 F.2d 442 (9th Cir., 1972), *cert. denied,* 419 U.S. 842, 95 S.Ct. 74, 42 L.Ed.2d 70 (1974) (ten year duration held to be reasonable); *Excello Wine Company v. Monsieur Henri Wines, Ltd., supra* (twenty-five year duration held to be reasonable).

The only writing which establishes terms relevant to the distributorship arrangement is the Quantity Purchase Program (QPP) (Defendants' Exhibit 21). At the bottom of the page captioned "terms of sale," in the paragraph marked "*IMPORTANT,*" the following language appears:

> All prices shown in this schedule cancel, supersede and replace those shown on prior dated schedules and are subject to change without notice. Additionally, Pennsylvania Tire Company reserves the right to modify or terminate any or all of the items listed above or any features of its program at any time without prior notice.

"[I]tems listed above" includes such things as freight terms, terms of payment, service charge on returned goods and price protection.

■ The quoted language suggests, at least, that the parties had agreed that "reasonable notice" pursuant to Section 1302.22 of the Revised Code meant no notice. Indeed, the testimony of Defendant's witness, Russell Miller, a former employee of Plaintiff, that everything was strictly "order to order" or "case by case," tends to support such a conclusion and a refusal of benefits at the point of their demand by Defendant would thus be sufficient notification. Paragraph (C) of Section 1302.22, however, imposes a limit to this line of reasoning as it invalidates an agreement dispensing with notification if its application would be "unconscionable." The Official Comment provides:

> An agreement dispensing with notification or limiting the time for the seeking of a substitute arrangement is, of course, valid under this division unless the results of putting it into operation would be the creation of an unconscionable state of affairs.

Indeed, it is possible for the court to find that, as between seasoned merchants, certainly an apt description of these parties, termination without prior notice is not commercially unreasonable and the distributorship agreement, to the extent the same may be found to exist, cannot now be sued upon. *See Sinkoff Beverage Co., Inc. v. Jos. Schlitz Brewing Co.,* 51 Misc.2d 446, 273 N.Y.S.2d 364, 3 U.C.C.Rep. 733 (N.Y.Sp.Ct., 1966) In defining unconscionability, one court has observed:

> Because there is no clear, all-purpose definition of 'unconscionable,' nor could there be, unconscionability must be determined on a case by case basis * * * giving particular attention to whether, at

the time of the execution of the agreement, the contract provision could result in unfair surprise and was oppressive to the allegedly disadvantaged party. *Zapatha v. Dairy Mart, Inc.* 381 Mass. 284, 408 N.E.2d 1370, 1376, 29 U.C.C.Rep. 1121, 1129 (1980). Impliedly, Section 1302.22 contemplates that some agreements dispensing with notification are not unconscionable and the court finds no such notice of termination to have been necessary here.

Even if the court were persuaded that the arrangement between the parties was improperly terminated, Plaintiff argues, with merit, that Defendant is without remedy, for any agreement found to exist is unenforceable for lack of mutuality of obligation.

The primary case relied upon by Plaintiff is *Burger Brewing Company v. Summer,* 261 F.2d 261 (4th Cir., 1958), which involved litigation quite similar in posture to this dispute. In *Burger,* the distributor sued for breach of contract and the trial court found for Plaintiff-distributor on the ground that termination of the arrangement had been without reasonable notice to the Plaintiff. The Court of Appeals reversed, characterizing the relationship between the parties as an agency and applying South Carolina law to the effect that an agency of no fixed duration is terminable without cause and without prior notice:

> It is the doctrine in South Carolina that an agency of no fixed duration may be ended at any time without cause and without previous notice unless the agent has devoted to the achievement of the aims of the agency a substantial consideration beyond his services. Otherwise in the latter circumstances the agent might suffer the loss of a consideration obviously invested on the assumption, plainly warranted, of the agency's continuance for such time as would presumably repay the outlay. But this reason does not obtain when the contribution of the agent is nothing appreciably above his services.

*Burger,* 261 F.2d at 262.

If viewed from the perspective of a contract of agency, Ohio law would seem to square with the *Burger* opinion:

> Ordinarily, where one grants authority to another to act as his agent for him, the authority so granted may be revoked at any time.

*Alliance First Nat. Bank v. Spies,* 158 Ohio St. 499, 502, 110 N.E.2d 483, 485 (1953).

The exception for agents which have invested consideration in the relationship, alluded to in the *Burger* opinion, appears also to exist under Ohio law as the Sixth Circuit, applying the law of this state, has ruled that an alleged lack of mutuality will not give rise to a right of termination at will where a distributor has in fact expended substantial consideration to advance the purpose of the distributorship. *Bach v. Friden Calculating Mach. Co.,* 155 F.2d 361 (6th Cir., 1946).

Several cases support the approach taken in *Burger.* For instance, in *Oak Distributing Co. v. Miller Brewing Co.,* 370 F.Supp. 889 (E.D.Mich., 1973), the district court notes at pages 906–07:

> The essence of the oral agreement was that the plaintiffs could continue to handle defendant's products as long as plaintiffs performed satisfactorily. Such agreements, be they oral or written, have been held to be terminable at will by either party. Since the agent is under no obligation to continue to represent the principal, the termination of the contract by the latter is not a breach of the contract, and will not sustain an action for damages.

*See also First Flight Associates, Inc. v. Professional Golf Co., Inc.,* 527 F.2d 931 (6th Cir., 1975); *Century Refining Co. v. Hall,* 316 F.2d 15 (10th Cir., 1963); *Sterling Colorado Agency, Inc. v. Sterling Insurance Co.,* 266 F.2d 472 (10th Cir., 1959); *Terre Haute Brewing Co. v. Dugan,* 102 F.2d 425 (8th Cir., 1939)

The evidence here supports Plaintiff's conclusion that "Moore's contribution was essentially limited to selling tires, something he would have done whether as an order-by-order customer or as a distributor." (Plaintiff's Post Trial Brief, p. 49)

## III

The court being satisfied as to the lack of any actionable claim by Defendant arising from the distributorship arrangement, there remains for disposition Defendant's assertions of breach of individual sales contracts, breaches of the warranty agreement described in Finding of Fact No. 10 and tort claims based upon fraud.

The breach of contract claim falters on two grounds: First, no significant factual breach of contract has been demonstrated, and second, Defendant would be barred from relief in any event due to its failure to timely notify Plaintiff of any perceived breach.

■ As to the first point, the bulk of Defendant's argument is premised upon a finding of the non-severability of the individual sales contracts from any distributorship arrangement existing between the parties. This theory has been rejected by the court in the preceding section, and the only actionable breach of contract alleged by Defendant is the failure of Plaintiff to adhere to its contractual promise to pay freight charges on tires shipped in September, 1979. Plaintiff has not refuted Dexter Moore's testimony on this point, and the notation "frt pd" appears on Plaintiff's Exhibit E–2 in the box designated "special instructions." The court finds a breach of the freight term of the sales contracts. However, the failure of Defendant to notify Plaintiff prevents any recovery on even this limited breach.

A buyer may claim damages for a seller's breach of contract, when the buyer has accepted the goods, pursuant to Sections 1302.88 and 1302.89 of the Ohio Revised Code. Specifically, these sections provide for damages for the difference in value of the goods as delivered and as warranted and any incidental and consequential damages. A condition precedent to recovery under Sections 1302.88 and 1302.89, however, is the giving of notice as required by Section 1302.65. The Official Comment to Section 1302.88 provides:

(1) This section deals with the remedies available to the buyer after the goods

have been accepted and the time for revocation of acceptance has gone by. In general, this section adopts the rule of the prior uniform statutory provision for measuring damages where there has been a breach of warranty as to goods accepted, but goes further to lay down an explicit provision as to the time and place for determining the loss.

The section on deduction of damages from price provides an additional remedy for a buyer who still owes part of the purchase price, and frequently the two remedies will be available concurrently. *The buyer's failure to notify of his claim under the section on effects of acceptance, however, operates to bar his remedies under either that section or the present section.* (Emphasis added)

Section 1302.65(C)(1) provides:

(C) Where a tender has been accepted:

(1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; * * *

Paragraph 4 of the Official Comment to this Section provides:

4. The time of notification is to be determined by applying commercial standards to a merchant buyer. * * *

The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. * * * The notification which saves the buyer's rights under this Chapter need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

There is no evidence before the court that any such notice of breach was given by the Defendant pursuant to Section 1302.65(C), at least prior to the filing of Defendant's responsive pleadings in this action.

The Sixth Circuit has recently responded to the question of whether notification in the form of the lawsuit itself is reasonable. Applying Ohio law, the court, in *Standard*

*Alliance Industries, Inc. v. Black Clawson Co.,* 587 F.2d 813 (6th Cir., 1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 396 (1979), focusing on the desirability of notice as an aid to settlement and preparation for litigation, said, at page 826:

> We do not know whether this lengthy, acrimonious lawsuit could have been settled beforehand. We do know that Standard Alliance's failure to give notice precluded the possibility of compromise.

Further, acknowledging the potential harshness of its ruling, the court, at page 828 of its opinion said:

> We realize that our holding bars what is apparently a meritorious claim. Standard Alliance's inexplicable failure to give any notice whatsoever that Black Clawson was in breach of its repair/replace warranty is fatal; underlying standards of commercial good faith, codified in UCC Section 2–607, mandate this result.

The same failure of notification, found above to defeat Defendant's claim of breach of contract, likewise destroys in large part its efforts to demonstrate a breach of warranty.

■ As to the 321 tires for which Defendant is seeking adjustment credits under the warranty program (Finding of Fact No. 14), Defendant made no attempt to return the tires for adjustment credit prior to this litigation. Plaintiff continued to make warranty adjustments after October 1, 1979, the date of filing of these proceedings, and it could only have honored its agreement if the tires in question had been submitted for adjustment. Defendant may not, in the court's opinion, simply assert its lack of "trust" in Plaintiff, as it does at pages 18–19 of its reply to Plaintiff's Post Trial Brief, and demand credit for the tires it says it has adjusted.

The situation confronting Plaintiff with respect to the adjustment of these 321 tires, for which Defendant claims a credit of $12,637.13, demonstrates the court's point in *Standard Alliance, supra,* that the seller is entitled to know the nature and extent of claims being asserted against it. As Plaintiff points out, not even Defendant has argued for a unilateral right to evaluate adjustments—the practice between these parties always incorporated Plaintiff's right to inspect and determine adjustment claims.

■ A harder question concerns allowances for adjustment of tires in use and as yet to be claimed defective. Defendant asserts that, based on its experience over several years preceding this controversy, it may expect to incur $10,000.00 in adjustment expenses through 1982. While this estimate is subject to Plaintiff's attack as being speculative, it is the best evidence offered to the court to evaluate what appears to be a legitimate obligation which Defendant will have to bear by virtue of its having sold Plaintiff's product. Therefore, the court will rely upon the unrefuted testimony presented and grant an allowance in the claimed amount.

## IV

Closely related to the breach of contract and breach of warranty claims is the affirmative defense of executory obligations, asserted by Defendant pursuant to 11 U.S.C. § 365. Briefly stated, Defendant argues that Plaintiff is barred from recovering payment for its tires due to Plaintiff's own breaches as to executory obligations, specifically its warranty replacement tire policy and its obligations flowing from the distributorship arrangement.

Section 365 of the Bankruptcy Code prohibits a trustee (or debtor in a case under Chapter 11) from assuming an executory contract unless any default is cured or adequate assurance of such cure is provided. As the choices of the trustee/debtor under Section 365 are limited to assuming or rejecting such a contract, an inability to assume a contract necessarily implies its rejection, which in turn constitutes a breach of that contract under Section 365(g). Defendant argues that Plaintiff, having ceased its business operations, is unable to assume its contractual obligations and should be barred from suing upon a contract which it has breached.

The previous two sections of this opinion have been devoted to the identification of the obligations which Plaintiff owes to Defendant. The court has found no subsisting obligation under the distributorship arrangement or for past warranty claims; only the award for the future warranty adjustment liability of Defendant can be traced to a prospective obligation of Plaintiff.

■ The liability for future warranty adjustments, while arguably "executory" in that payments have not yet come due or been made, does not establish an executory contract within the meaning of Section 365. To fall within the ambit of Section 365, a contract must be one, "on which performance remains due to some extent on both sides. A note is not usually an executory contract if the only performance that remains is repayment." House Report No. 95–595, 95th Cong., 1st Sess. (1977) 347, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6303–04.

■ Plaintiff has referred the court to the case of *In re Select-A-Seat,* 625 F.2d 290 (9th Cir., 1980), which employed the so-called Countryman definition of executory contracts in its reasoning. The court in *Select-A-Seat,* construing Section 116 of the former Bankruptcy Act, opined that a contract was only executory if so far unperformed that a failure of either party to complete performance would be a material breach which would excuse the performance of the other. *Id.* at 292. Under the circumstances of this case, it cannot seriously be argued that the prospective breach of warranty is material to the sales contracts or would excuse Defendant from paying the contract price, and this court has so found in the initial stages of this memorandum. As the future obligations of Plaintiff under the contract are not material to the contract as a whole, Section 365 cannot apply.

## V

Next, Defendant argues that the decision made by the Board of Directors of Mansfield on September 6, 1979 to discontinue tire production at the company's Tupelo, Mississippi plant was a fact material to subsequent sales of Pennsylvania tires to Defendant, and that Plaintiff's failure to disclose such information is an actionable fraud upon Defendant.

■ To prevail on its theory of fraud by concealment, it is necessary for the defendant to prove a failure to disclose a material fact where there exists a duty to speak. *Miles v. McSwegin,* 58 Ohio St.2d 97, 388 N.E.2d 1367 (1979); *Klott v. Associates Real Estate,* 41 Ohio App.2d 118, 322 N.E.2d 690 (1974); 24 O Jur 2d *Fraud and Deceit* § 74 (1957). The court finds that neither materiality nor the existence of a duty to speak has been established by the evidence.

■ On the question of materiality, it was shown that Dexter Moore learned of the cessation of Plaintiff's business operations on or about October 1, 1979. Notwithstanding that knowledge, which Defendant acquired shortly after receiving the September shipments of tires, Defendant did nothing to revoke acceptance of the goods, it made a subsequent account payment on October 11, 1979, and Dexter Moore reaffirmed his desire to retain and sell the tires in question after being apprised of the allegedly concealed information. (Finding of Fact No. 6) All of the above facts demonstrate that Defendant did not consider said information to be material to the transactions in question.

■ A duty to disclose is also absent in the present situation. Such a duty is not imposed by the mere relationship of vendor and purchaser, but instead arises only when the vendor has knowledge of a material fact which is not readily discoverable by the vendee. *Klott, supra; see also Miles v. McSwegin, supra; Landy v. Waller,* 91 Ohio L. Abs. 417, 186 N.E.2d 498 (Ct. of Appeals, Cuyahoga Cty.1962). While it is true that Defendant was unaware of specific plans to close the Tupelo plant until October of 1979, it certainly knew enough to make an informed assessment of the risk involved in an arm's length transaction with Plaintiff. Indeed, the evidence presented shows that a decision to close the Tupelo plant was for-

malized on September 6, 1979, some two months after the purchase orders were placed, giving rise to the conclusion that Plaintiff possessed no specific plans which it could have concealed at the point of contract formation. For these reasons, the burden of proof as to fraud has not been met by Defendant.

## VI

Defendant has also raised the question of its right to setoff or recoupment in this matter. As the benefit of either doctrine is dependent upon the finding of an obligation owing from Plaintiff to Defendant, this inquiry will be limited to the right of Defendant to deduct the breach of warranty damages previously awarded on its counterclaim herein from its obligation to pay for tires sold and delivered.

■ Setoff may be distinguished from recoupment in that the former concept involves debts arising from separate transactions, whereas the latter pertains to debts arising from the same transaction. *See 4 Collier on Bankruptcy,* para. 553.03 (15th Ed., 1981). The court is of the opinion that recoupment is appropriate in this situation, making it unnecessary to consider the question of setoff.

Unlike setoff, recoupment raises matter which directly reduces the amount of damages claimed by Plaintiff, and it follows that recoupment is available without regard to the requirements of 11 U.S.C. § 553.[2] In speaking of this distinction and its effect upon the need for resort to setoff under Section 68 of the Bankruptcy Act of 1898, one court has observed:

> Where the matter is one of recoupment or defense, a defendant need not rely upon § 68(a), because he would merely be proving that he is not liable in full for the plaintiff's claim.

*Quittner v. Los Angeles Steel Casting Co.,* 202 F.2d 814, 816 n. 3 (9th Cir., 1953).

**2.** *See 4 Collier on Bankruptcy,* para. 553.03 (15th Ed., 1981), which suggests that the concern of limiting setoff to instances involving

■ The court is satisfied that the respective liabilities of Plaintiff and Defendant stem from the same set of transactions, as the tires in question were sold to Defendant with express warranties under the program then in effect; a refusal to allow recoupment would ignore the integration between contract and warranty which is one of the main features of Article 2 of the Uniform Commercial Code. In Ohio, Revised Code § 1302.26(A)(1) provides:

> (A) Express warranties by the seller are created as follows:
>
> (1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and *becomes part of the basis of the bargain* creates an express warranty that the goods shall conform to the affirmation or promise. (Emphasis added)

As the warranty is merged with other contract terms by the above statutory language, the finding of a single integrated transaction follows and recoupment should be allowed.

## VII

In addition to the allegations and defenses related to the contracts of sale, the liability of Defendants Dexter and Jane Moore as guarantors of the indebtedness of Dex Moore Firestone must be determined.

On April 15, 1972, Defendants Dexter and Jane Moore executed and delivered a guaranty to Plaintiff. (Finding of Fact No. 11) In relevant part, the guaranty provided:

> [T]he undersigned shall pay to the Company [Plaintiff] forthwith when due, or upon demand thereafter, with interest, and without deduction for any claim of setoff or counterclaim of the customer or loss of contribution from any co-guarantor, the full amount of all indebtedness, obligations and liabilities of every kind and nature due to the Company from the Customer, together with all expenses of collection and reasonable counsel fees incurred by the Company by reason of the default of the Customer.

mutual debts is absent by definition in the recoupment situation, where both claims arise from a single transaction or set of transactions.

Said guaranty was to be continuing in nature and unlimited in amount, subject to prospective revocation upon written notice to the Plaintiff. A further provision of the guaranty stated that the obligation of Defendants was primary, unconditional, and enforceable before or after proceeding against the principal, Dex Moore Firestone. (Defendants' Exhibit C-1)

■ The court agrees with Plaintiff's position that the guaranty of Defendants was absolute and unconditional, making it unnecessary for Plaintiff to first exhaust its remedies against Dex Moore Firestone as principal; Defendants do not dispute this point. *See generally* 38 Am Jur 2d *Guaranty* §§ 21–22 (1968); 26 O Jur 2d *Guaranty* § 9 (1957).

■ While it is generally recognized that a guarantor who is sued jointly with his principal may assert the defenses and setoffs of the principal against the guarantee, *see* 38 C.J.S. *Guaranty* §§ 88–89 (1943), in the present situation Defendants appear to have waived the benefit of the principal's setoffs and counterclaims by the terms of the guaranty. Plaintiff refers to the case of *Rusch Factors Division of BVA Credit Corporation v. Sheffler*, 58 App.Div.2d 557, 396 N.Y.S.2d 374 (1977) as support for the proposition that a guarantor may waive such rights, and the court finds the instant waiver to have been effective.

■ Plaintiff further notes that the waiver of Defendants does not extend to "defenses" of the principal, and then suggests that none of the claims raised in this action by Defendants are properly denominated as defenses, but instead are counterclaims. The protest of Defendants as to excessive interest charges, sustained in a preceding portion of this opinion, is properly a "defense" which is not lost by virtue of the above waiver, but all remaining claims of Defendants are indeed counterclaims as defined by federal practice under F.R.C.P. 13. (See *Moore's Federal Practice* para. 13.02 (1980), which states that a counterclaim is any claim against an opposing party, including recoupment and setoff.) Consequently, Defendants Dexter and Jane Moore are liable in full for the contract price of goods sold to Dex Moore Firestone and allowable interest thereon.

## VIII

The court finds no merit in any counterclaim or affirmative defense raised by Defendants and not specifically discussed above.

## CONCLUSIONS OF LAW

■ 1. A contract buyer has performed an act inconsistent with a seller's ownership of specific goods by offering to resell those goods; such an act constitutes an acceptance of goods.

■ 2. An action for the price of goods sold is appropriate where the buyer has accepted the goods in question.

■ 3. Under Ohio law, when money becomes due and payable upon an account and the parties thereto have not stipulated to a rate of interest for overdue amounts, interest may nonetheless be collected as provided in Section 1343.03 of the Ohio Revised Code.

■ 4. An actionable breach of express warranty is established when a seller of goods wrongfully terminates a warranty which served as a basis of the bargain for said goods.

■ 5. A contract buyer which is liable for the price of goods sold on account (and interest thereon) may utilize the doctrine of recoupment to reduce its liability by the amount of damages awarded to it on a counterclaim for breach of warranty as to said goods sold on account.

■ 6. A guarantor on an absolute or unconditional guaranty may waive the benefit of setoffs and counterclaims available to the principal.