IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 9, 2003 Session

## JAY JOHNSON, ET AL. v. REED WELCH, ET AL.

**Appeal from the Circuit Court for Putnam County**
**No. 99 N 0330      John J. Maddux, Jr., Judge**

_____

**No. M2002-00790-COA-R3-CV - Filed February 9, 2004**

_____

This appeal involves a business dispute with multiple claims for breach of three separate contracts. The trial court found Reed Welch and his company, S& S Screw Machine Company, Inc., in breach in various ways and awarded a total of $1,032,133.15 in damages to Jay and Gail Johnson, both personally and as the owners of Quality Metal Treating, Inc. We affirm in part and reverse in part the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed in part, Reversed in part, and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and RUSS HELDMAN, SP. J., joined.

Jay S. Bowen, Timothy L. Warnock, Taylor A. Cates, Nashville, Tennessee, for the appellants, Reed Welch, Olive Welch, Quality Metal Treating, Inc., and S&S Screw Machine Co., Inc.

S. Roger York, Crossville, Tennessee; William S. Walton, Nashville, Tennessee, for the appellees Jay Johnson and QMT Quality Metal Treating, Inc.

### OPINION

This is a breach of contract action arising from three separate agreements. The first is an employment agreement between S&S Screw Machine Co., Inc. ("S&S")[1], and Jay Johnson. The second contract involves the purchase of a heat treating business known as Quality Metal Treating, Inc. ("QMT"), by Jay Johnson and his wife, Gail Johnson, from Reed Welch and his wife, Olive

---

[1]S&S is a subchapter S corporation, and 100% of its stock is owned by Reed Welch. During the time period of the transactions at issue, Olive Welch also owned stock in S&S. When Mr. and Mrs. Welch divorced, she conveyed her stock in S&S to Mr. Welch, and he indemnified her from any liability resulting from this litigation.

Welch. The final agreement involves the Johnsons' lease and subsequent purchase of commercial property from the Welchs.

## I. THE TRANSACTIONS

In April, 1993, Reed Welch hired Jay Johnson to become the general manager of his business, S&S.[2] The company manufactures screw machine parts for industrial tractor trailers and dump trucks. Mr. Johnson's new position required him to relocate to Tennessee from Washington state with his family. The employment agreement provided that S&S would pay part of the Johnsons' relocation expenses, and Reed Welch personally guaranteed S&S's commitment. The agreement had two provisions entitled "Relocation Expenses" which specifically provided:

> Relocation Expenses: Temporary living expenses and transportation will be provided by S&S Screw Machine Company.

> Relocation Expenses: Expenses associated with the sell [sic] and purchase of a home, moving of household goods and relocating my family will be shared by both me and S&S Screw Machine Company.

Contemporaneously with the signing of the employment agreement, Mr. Johnson presented Mr. Welch a list entitled "Anticipated Re-location Expenses" which estimated the expenses to be approximately $35,000. Following the move, on July 30, 1993, Mr. Johnson provided Mr. Welch with a letter setting forth a total of $29,986.77 in relocation expenses and requested that S&S pay its portion. S&S delayed payment for almost nine months and then reimbursed the Johnsons for only $5,000 of the expenses.

Despite S&S's failure to promptly reimburse the Johnsons for relocation expenses, in October, 1993, the Johnsons purchased the on-going business, QMT, from the Welchs for $186,000. QMT heat treats specialized auto and truck parts such as those produced by S&S.[3] In fact, S&S was QMT's largest customer, and the QMT furnaces were uniquely suited to heat treat S&S parts. Approximately 50 to 60 percent of QMT's revenue was generated by heat treating S&S parts. The parties executed a sales contract which included the following language:

---

[2]Mr. Johnson testified that he had wanted to relocate to Tennessee from Washington and had submitted his resume to Mr. Welch. They spoke over the telephone and eventually reduced their agreement to writing. Mr. Johnson felt that Mr. Welch's offer presented a good business opportunity with an annual base salary of $65,000. In addition, he anticipated that his income would increase approximately $20,000 to $30,000 through the profit sharing and bonus program.

[3]The heat treating business does not require manufacturing or machining of parts. Instead, the heat treating process involves carburizing, neutral hardening, stress relieving, carbonitriding, annealing and induction heat treating. Essentially, heat treating is a process by which tools and parts are heated and then cooled to increase their hardness.

Buyers [Johnsons] . . . .will have the exclusive rights to heat treat all of the metal treating process required of all goods manufactured by S&S Screw Machine Co., Inc. coming under Quality Metal Treatment, Inc.'s capabilities as long as Quality Metal Treatment, Inc. is competitive in price, quality and delivery. The price specified in paragraph 6 below is agreed to be 'competitive' price. S&S Screw Machine Co., Inc. agrees it will not decrease its production requiring heat treatment to be supplied by Buyers except in the ordinary course of business, i.e. loss of business due to competitiveness in price, quality and delivery.

The provision of the agreement giving QMT the exclusive right to all of S&S's requirements for heat treating (also referred to herein as the exclusivity or requirements provision) was crucial to the Johnsons obtaining financing for the purchase of QMT. Indeed, the *pro forma* submitted to the lending institutions specifically identified various parts that were produced by S&S and anticipated to be heat treated by QMT. Prior to the transaction, Mr. Johnson had requested and Mr. Welch had provided a list of parts produced by S&S that could be expected to be heat treated by QMT.

Shortly after the deal closed, S&S lost its contract to make three Paccar parts that had been included in the *pro forma* and on the list provided by Mr. Welch. The three lost Paccar parts had accounted for almost 40 % of the revenues QMT had generated from S&S work. Mr. Welch had met with Paccar's engineers in Seattle earlier in the year concerning the re-design of the parts S&S made for Paccar. S&S did not have the capability at the time to make the re-designed parts. Mr. Welch never disclosed this information to the Johnsons prior to the sale of QMT. As a result, QMT and its new owners, the Johnsons, lost a substantial portion of its expected revenue from heat treating the Paccar parts.

When the Johnsons purchased the assets of QMT, they agreed to continue to operate it at its then current location in Hendersonville until the lease in effect at that location expired in February of 1997. The Johnsons also agreed to move the business to property owned by the Welchs in Cookeville after the expiration of the Hendersonville lease so that QMT would be closer to the S&S plant in Sparta. In furtherance of that mutual plan, on the same day the Johnsons purchased QMT from the Welchs, they entered into a separate five year Lease and Purchase Option Agreement with the Welchs for their building and land in Cookeville.

The two agreements stated that the Johnsons would have no liability under the existing lease for the Hendersonville property, but that QMT would pay the Welchs $1600 per month on the lease for the Cookeville property during the term of the Hendersonville lease. In other words, Mr. Welch remained personally liable to the Hendersonville landlord until February, 1997, but the Johnsons paid the amount of the Hendersonville lease to Mr. Welch as rent on the Cookeville property QMT would not occupy until February of 1997.

The two documents, the agreement for the purchase of QMT's assets and the lease with option to purchase, contained provisions regarding the parties' responsibilities for the relocation of QMT. The sales contract provided:

Reed Welch agrees to prepare the real property to be leased to Buyer for occupancy of the heat treating process. This will include but will not be limited to, the following work:

****

(c) Assist in relocation . . . , installation and start-up of all the office and industrial assets being purchased hereunder when the previously mentioned February 17, 1992 lease on the premises [in Hendersonville] is terminated, or at such time as Quality Metal Treatment, Inc. ceases its rental payment under that lease. The relocation, installation and start-up project to be no more than a period of three (3) months.

Buyers will have the responsibility of making a physical layout as to where all office and industrial assets being purchased hereunder, are to be placed in the industrial facility in Cookeville, TN (described herein) and Lessors will have the responsibility to relocate, install and start-up all the office and industrial assets being purchased, utilizing S&S Screw machines, maintenance personnel and equipment.

The lease contained the same provision, with small variation in the language.

Following the QMT sale in October of 1993, Mr. Johnson continued as the general manager at S&S during the day and worked weekends and some evenings at QMT. In late 1996, shortly before the expiration of QMT's Hendersonville lease, the Johnsons exercised their option to purchase the Welchs' Cookeville building and land for an additional $275,000.

QMT moved to the property in Cookeville. Subsequently, a dispute arose over whether S&S had honored its obligations associated with the moving and installation and start-up of QMT's equipment. According to the Johnsons, S&S failed to properly set up the equipment and actually damaged some of the equipment. Edward Newman, a long time S&S employee, admitted that several of the furnaces and other pieces of QMT equipment were damaged by S&S during the move from Hendersonville. Mr. Newman further testified that he had never installed such equipment before. S&S never repaired the damage allegedly done by its employees, and the machinery was not set up and ready to function on time. As a result of this situation and Mr. Welch's threats to terminate the contract if QMT missed any deliveries, Mr. Johnson was forced for nearly six months to outsource parts for heat treatment to another heat treater until he could complete repairs, installation and start-up. He claimed he incurred expenses of over $65,000 due to S&S's failure to abide by the terms of the relocation assistance provision in both contracts.

In the same month the Cookeville deal closed and Mr. Welch's obligation on the Hendersonville lease expired, Mr. Johnson's employment with S&S was terminated without notice. Mr. Johnson testified that Mr. Welch fired him. Mr. Welch testified at trial that Mr. Johnson had "terminated himself" as general manager of S&S due to a conflict of interest, *i.e.*, being manager of

4

S&S and owner of QMT, although that situation had existed with Mr. Welch's full knowledge and encouragement since the Johnsons bought QMT in 1993. After Mr. Johnson's employment at S&S was terminated, Mr. Welch stated to the Department of Employment Security that Mr. Johnson had quit. As to these claims by Mr. Welch, the trial court found "[b]asically, none of that was accurate and none of that was true." The court found that Mr. Johnson was fired by Mr. Welch in February of 1997.

Mr. Welch replaced Mr. Johnson as general manager of S&S with his son, Jerald Welch. When Mr. Johnson was fired, it placed his family in a financial bind due to the outstanding payments due the Welchs for QMT and the real property. The Johnsons managed by selling their home and other assets and lived in the plant.

After the relocation of QMT to Cookeville, QMT continued to provide heat treating services to S&S until that arrangement was terminated by S&S sending all its heat treating business elsewhere in August of 1999. During the time between the relocation, which coincided more or less with the termination of Mr. Johnson's employment with S&S, and the cessation of all business between the two companies, several events occurred which were discussed at trial.

During this time, the Johnsons became increasingly concerned that Mr. Welch wanted to take the heat treating process back into his business. Although Mr. Welch denied this, his actions confirmed the Johnsons' suspicions. In 1998, Mr. Welch attended an auction in Ohio of heat treating equipment. According to Kenneth Robertson, a heat treater who attended the auction, Mr. Welch told him that he was "getting into the heat treating business." Mr. Welch explained he was unhappy with his current heat treater. "He was very derogatory with a lot of profanity referring to his present heat treater." Mr. Roberston did not recall Mr. Welch complaining about the quality of the heat treating. James Cooper attended the auction with Mr. Robertson and testified to the same effect regarding Mr. Welch attending the auction. In addition, Mr. Welch sent his son, Jerald Welch, to seminars and conventions for heat treaters during late 1998 and the spring of 1999 to investigate the expense to S&S of purchasing new heat treating equipment and taking the heat treating business in-house. Jerald Welch testified that S&S was considering bringing the heat treating in-house and he investigated the advantages and costs of that.

To compound the Johnsons' financial strain, S&S began to "slow pay" QMT after the move to Cookeville in 1997. Because QMT was a small business and was dependent upon S&S for a substantial portion of its revenues, the timely payment of invoices was particularly important. The sales contract had recognized this fact by requiring invoices to be paid within 7 days for the first three years and within 30 days thereafter. Tensions between Mr. Johnson and S&S mounted.

In April of 1999, Jerald Welch began secretly outsourcing S & S parts for heat treating to another heat treater. When Mr. Johnson learned of the outsourcing, he brought the exclusivity language to the attention of Jerald Welch, who said he was unaware of the contract.

5

In the summer of 1999, a problem arose concerning a shock absorber part. S&S Quality Assurance Director Lawrence Biss noticed a crack in one of the lots and, consequently, recalled seven lots for further inspection of each part. A small number of these parts were determined to have cracks, but the majority were shipped to customers without incident.

After sending off for lab testing of the cracked parts, in July of 1999 Mr. Biss notified QMT of the cracks and asked for a determination as to the cause of the cracks. S&S's lab had determined the cracks were quench cracks, meaning they occurred during the quenching part of the heat treating process, but did not identify a cause of the cracking. QMT responded promptly that it has inspected the part and also sent the part to a metallurgist at Metallurgical Technologies to investigate the cause of the crack. The parties agreed to send the parts to a third party for further testing. Meanwhile, Metallurgical Technologies concluded that the cracks were most likely caused by poor alloy in the steel that was used to manufacture the parts or poor design. Mr. Johnson shared this report with S&S.

Jerald Welch became frustrated with Mr. Johnson for not accepting responsibility for the quench cracks. On August 26, 1999, he sent Mr. Johnson a strongly worded letter directing QMT to remove the terms of its limited warranty and limitation of remedies from all its invoices. Jerald Welch further advised Mr. Johnson in the letter that S&S would no longer accept or pay over such terms. The terms now objected to were the same terms that had appeared on QMT invoices for years. At trial, Jerald Welch testified that he had subsequently learned the QMT language was standard practice within the heat treating industry and that his current heat treater, Carolina Commercial Heat Treating, uses the same or similar terms.

In response to Jerald Welch's demand that the limitation terms appearing on the invoices would no longer be accepted by S&S, Mr. Johnson advised Jerald Welch by letter that S&S had breached the contract between S&S and QMT with his demand, but QMT would continue to process S&S purchase orders under the terms stated in the invoices. Other correspondence ensued, and the trial court found that, "In response to S&S's decision to seek other heat treaters and refusal to accept QMT's invoices, Mr. Johnson told S&S that QMT expected to be paid C.O.D. for its heat treating work as it was performed."

On August 31, 1999, Jerald Welch ordered a QMT truck to unload S&S parts headed to QMT for heat treating, and directed that no other parts be sent to QMT for heat treating. Since that day, S&S has not sent any heat treating work to QMT and instead has sent all heat treating business to Carolina Commercial Heat Treating. In addition, S&S refused to pay QMT for heat treating work already performed, withholding an amount S&S claimed it had expended in dealing with an earlier rust problem and the cracking problem.

In September, 1999, QMT and the Johnsons filed this lawsuit against S&S and the Welchs alleging various instances of breach of contract: (1) failure to pay the Johnsons' personal relocation expenses; (2) failure to pay QMT expenses incurred in relocating the business to Cookeville; (3) refusal to pay incurred invoices for heat treating work already performed for S&S by QMT; (4)

concealment of pertinent information prior to the sale of QMT; and (5) termination of the business relationship resulting in substantial loss of revenue for QMT.

Following a three day bench trial, the trial court ruled in favor of the Johnsons and QMT on all claims.[4]  The court awarded the Johnsons damages, including prejudgment interest, as follows:

- $30,689.86 for the personal relocation expenses;
- $96,317.43 for expenses related to the QMT relocation;
- $9,036.86 for the unpaid invoices for work performed;
- $821,689.00 for four years of lost profits due to termination of the agreement for QMT to do all of S&S's heat treating;
- $74,400.00 as partial rebate of the purchase price the Johnsons paid for QMT based upon Mr. Welch's failure to disclose S&S's need for heat treating would likely decrease because of the impending loss the Paccar business.

The trial court made extensive (twenty-two pages) findings of fact as well as thorough conclusions of law.  In addition, the trial court awarded attorneys fees to QMT pursuant to the QMT purchase agreement, and at a subsequent hearing set the attorneys fees at $63,612 and awarded discretionary costs in the amount of $16,619.35.

## II. STANDARD OF REVIEW

The standard of review on appeal is well-settled. We review the trial court's findings *de novo,* with a presumption of the correctness of the factual findings of the trial court, unless the evidence preponderates otherwise.  Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001).  No such presumption of correctness attaches to the trial court's conclusions of law. *Southern Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Here, seventeen witnesses testified and various documents were entered into evidence.  As to a number of instances of disputed facts where the testimony of Mr. Welch differed from that of other witnesses, the trial court made specific findings that Mr. Welch's statements were not true and not accurate.  In addition to these specific findings on credibility, the court also made general statements that it was favorably impressed with the credibility of Mr. Johnson and several witnesses on his behalf.  In addition, the court stated, "the Court was not persuaded by the testimony of Reed Welch, and Jerald Welch, and Lawrence Biss."

Because trial courts are in a far better position than this court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker,*

---

[4]The Johnsons had also alleged S&S wrongfully refused to pay Mr. Johnson a discretionary bonus or allow him to participate in profit-sharing programs.  The trial court  ruled against Mr. Johnson on this claim, and that ruling has not been appealed.

957 S.W.2d 834, 837 (Tenn. Ct. App.1997). Consequently, where issues of credibility and weight of testimony are involved, appellate courts will accord considerable deference to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999) (quoting *Collins v. Howmet Corp.*, 970 S.W.2d 941, 943 (Tenn. 1998). Stated another way, "The credibility accorded by the trier of fact will be given great weight by the appellate court." *Weaver v. Nelms*, 750 S.W.2d 158,160 (Tenn. Ct. App. 1987); *see also In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn. 1997); *Whitaker*, 957 S.W.2d at 837; *Doe v. Coffee County Bd. of Educ.*, 925 S.W.2d 534, 537 (Tenn. Ct. App. 1996).

To the extent the issues raised herein involve interpretation of written agreements, the question of interpretation of a contract is a question of law. *Guiliano v. CLEO, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal. *Id.*; *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). This court must review the document ourselves and make our own determination regarding its meaning and legal import. *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993). Our review is governed by well-settled principles.

"The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The purpose of interpreting a written contract is to ascertain and give effect to the contracting parties' intentions, and where the parties have reduced their agreement to writing, their intentions are reflected in the contract itself. *Id.*; *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). "The intent of the parties is presumed to be that specifically expressed in the body of the contract . . . ." *Planters Gin Co.*, 78 S.W.3d at 890. Therefore, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Guiliano*, 995 S.W.2d at 95; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975).

Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes; but, where a contractual provision is ambiguous, *i.e.*, susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. *Planters Gin Co.*, 78 S.W.3d at 890. In that situation, courts must resort to other rules of construction, and only if ambiguity remains after application of the pertinent rules does the legal meaning of the contract become a question of fact. *Id.* However, a strained construction may not be placed on the language used by the parties to find or create ambiguity where none exists. *Id.* at 891.

Thus, courts defer to the contracting process by enforcing written contracts, which establish the rights and obligations of the parties, according to their plain terms without favoring either contracting party. *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985); *Hardeman County Bank v. Stallings*, 917 S.W.2d 695, 699 (Tenn. Ct. App. 1995). Courts must avoid rewriting an agreement under the guise of interpreting it. *Marshall v. Jackson*

*& Jones Oil, Inc.*, 20 S.W.3d 678, 682 (Tenn. Ct. App. 1998). The courts will not make a new contract for parties who have spoken for themselves, *Petty v. Sloan*, 197 Tenn. 630, 640, 277 S.W.2d 355, 359 (1955), and will not relieve parties of their contractual obligations simply because these obligations later prove to be burdensome or unwise. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 223 (Tenn. Ct. App. 2002).

Courts may and will incorporate a reasonableness requirement into any contract. *Hurley v. Tenn. Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 892 (Tenn. Ct. App. 1995) (holding that insurance company's demand for production of financial records and assertion that insured's failure to produce was a breach of the cooperation clause of the insurance contract could be considered unreasonable); *Moore v. Moore*, 603 S.W.2d 736, 739 (Tenn. Ct. App. 1980) (holding that "a qualifying word which may be read into every contract is the word 'reasonable,' or its equivalent 'reasonably.'"). In fact, this court has stated that the qualifying word "reasonable" *must* be read into every contract. *Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993); *see also Hathaway v. Hathaway*, 98 S.W.3d 675, 679 (Tenn. Ct. App. 2002) (reasonableness must be read into agreement).

Further, in construing contracts, courts must look at the language and the parties' intent and impose a construction that is fair and reasonable. *ACG, Inc. v. Southeast Elevator, Inc*. 912 S.W.2d 163 (Tenn. Ct. App. 1995). Reasonableness must be viewed in light of the parties' situation at the time of the making of the agreement as well as at the time performance becomes due. *Hathaway*, 98 S.W.3d at 680-81. The language of a contract should be construed with reference to the situation of the parties, the business to which the contract relates, the subject matter of the agreement, the circumstances surrounding the transaction, and the construction placed on the contract by the parties in carrying out its terms. *Penske Truck Leasing Co., L.P. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990); *International Flight Center v. City of Murfreesboro*, 45 S.W.3d 565, 570 (Tenn. Ct. App. 2001). Similarly, when a court is called upon to supply a missing term with a reasonable one, it must consider the subject matter of the contract, the situation of the parties, their intention in what they contemplated at the time the contract was made, and the circumstances attending the performance. *Minor*, 863 S.W.2d at 54. The course of conduct of the parties is strong evidence of the parties' original intent. *Pinson & Associates v. Kreal*, 800 S.W.2d 486, 487 (Tenn. Ct. App. 1990).

It is well settled that under Tennessee law there is in every contract an implied duty of good faith and fair dealing. *Wallace v. National Bank of Commerce,* 938 S.W.2d 684 (Tenn.1996); *Spectra Plastics, Inc. v. Nashoba Bank*, 15 S.W.3d 832, 843 (Tenn. Ct. App. 1999). In *Wallace*, the Tennessee Supreme Court addressed the nature of the duty of good faith in the performance of contracts:

> In Tennessee, the common law imposes a duty of good faith in the performance of contracts. This rule has been considered in several recent decisions of the Court of Appeals. The law regarding the good faith performance of contracts was well stated by the Court of Appeals in *TSC Industries, Inc. v. Tomlin,* 743 S.W.2d 169, 173 (Tenn. App.1987):

9

> It is true that there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement, and a person is presumed to know the law. *See* Restatement (2d) Contracts, § 205 (1979). What this duty consists of, however, depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable.

*Wallace*, 938 S.W.2d at 686. The *Wallace* court also cited with approval other opinions of this court that held that good faith in performance is measured against the intent of the parties as evidenced by a fair and reasonable interpretation of the terms of the contract. *Id.*

Finally, with respect to damages, the proper measure of damages is a question of law and therefore subject to *de novo* review with no presumption of correctness. *Beaty v. McGraw*, 15 S.W.3d 819, 829 (Tenn. Ct. App. 1998). The proper amount of damages is a question of fact. *Id*.

### III. Termination Of The business arrangement

S&S effectively terminated its agreement to use QMT for all its heat treating business without actual notice by sending all its business elsewhere after August of 1999. *Simonton v. Huff*, 60 S.W.3d 820, 827 (Tenn. Ct. App. 2000) (holding that under Tennessee law a cause of action for breach of contract arises when one of the parties demonstrates a total and unqualified refusal to perform under the contract). The trial court found held that "S&S was not justified in terminating the contract as of August 31, 1999," and that S&S "breached the contract when it sent its heat treating services to Carolina Commercial Treating."

The QMT purchase/sale agreement stated that the Johnsons "will have exclusive rights to heat treat all of the metal treating process required of all goods manufactured by S&S Screw Machine Co., Inc. coming under Quality Metal Treatment, Inc.'s capabilities **as long as** Quality Metal Treatment, Inc. is competitive in price, quality, and delivery." (emphasis added).

S&S asserts that the finding of the trial court that S&S had breached the contract was in error for two reasons: (1) that the agreement was terminable at will by either party and (2) S&S terminated the agreement for cause.

10

## A. DURATION OF THE EXCLUSIVITY OBLIGATION

The trial court found that when this agreement was executed, "all the parties agreed that this was to be a long-term contract for QMT to exclusively heat treat S&S's parts." The court noted a memorandum Mr. Welch sent to an S& S employee confirming QMT's exclusive right to all of S&S's heat treating business. The court also relied on the testimony of Mr. Welch himself to the effect that the contract would not end as long as the conditions were satisfied.

S&S asserts that the contract was, as a matter of law, terminable at will because it included no specific termination date or duration provision, relying primarily on *First Flight v. Professional Golf Co,* 527 F.2d 931(6th Cir. 1975). In *First Flight*, the court interpreted a contract for sales representation on specific products for a specified territory that provided that the right of representation "was not an irrevocable right" but would remain in effect only so long as the representative did satisfactory business as a contract for an indefinite duration. The court then held that contracts silent on the time of duration are generally terminable at will by either party with reasonable notice. *Id.* at 935. The court did not state that it was applying Tennessee law, but instead cited a treatise as authority for that holding. That treatise now states, in pertinent part:

> A contract is not invalid for indefiniteness for the mere reason that it does not specify how long performance should continue. If the surrounding circumstances do not indicate the parties' intentions, the court may hold that the contract will remain in effect for a reasonable time, or that the contract is terminable at will by either or both parties, or terminable on the occurrence of a specific event, or terminable by one of the parties only on condition of some act or forbearance by that party.

5 MARGARET N. KNIFFIN, CORBIN ON CONTRACTS §24.29 (rev. ed. 1998).

Which of these results is adopted by the courts depends to a large extent on the language of the agreement itself as well as the intent of the parties. Where the contract itself does not state its duration, courts have generally held that it should be effective for a reasonable time or terminable at will with reasonable notice. *Id.*[5] Where, however, the parties have indicated an intent that their contractual obligations last indefinitely until the occurrence of a particular event, many courts have concluded that the contracts are terminable only upon the occurrence of that event. *Id.* Thus, where a contract does not include a termination date but does include the right to terminate upon the happening of specified circumstances, courts will generally interpret the contract as remaining in force until terminated for cause.

---

[5]In at least one case, the court held the contract terminable "only after a reasonable duration **and** reasonable notice." *Italian & French Wine Co. of Buffalo, Inc. v. Negociants U.S.A., Inc.*, 842 F. Supp. 693, 699 (W.D.N.Y. 1993) (emphasis added). Important to that decision were the efforts and expense already undertaken by one party.

The leading case in this area is *Warner-Lambert Pharmaceutical Company, Inc. v. John J. Reynolds, Inc.*, 178 F. Supp. 655, (S.D.N.Y. 1959), *aff'd per curiam*, 280 F.2d 197 (2d Cir. 1960), wherein the manufacturer of Listerine had agreed to pay royalties for use of the secret formula for that product based upon the amount sold and, many years later, sought to be relieved of that obligation when the secret formula was no secret any more. One of the arguments made by the manufacturer was that the contract did not have a termination date and, therefore, was a forbidden "perpetuity" that the law would not enforce. The court found, first, that "[t]he mere fact that an obligation under a contract may continue for a very long time is no reason in itself for declaring the contract to exist in perpetuity or for giving it a construction which would do violence to the expressed intent of the parties." *Id.* at 663.

The court acknowledged the general rule that where the contract includes no termination date and it appears the parties did not contemplate a termination date or their intention cannot be ascertained, the contract will be held to be terminable within a reasonable time or revocable at will, dependent upon the circumstances. Because courts are loathe to infer a perpetual obligation, generally the date or condition of termination will be determined from the actual intention of the parties. *Id.* However, the court distinguished the contract before it from those falling within this rule:

> Contracts which provide no fixed date for the termination of the promisor's obligation but condition the obligation upon an event which would necessarily terminate the contract are in quite a different category and it is in this category that [the contracts at issue] fall. On the face of the agreements the obligation of [the original manufacturer] and its successors to pay is conditioned upon the continued manufacture or sale of Listerine. When they cease manufacturing or selling Listerine the condition for continued payment comes to an end and the obligation to pay terminates. This is the plain meaning of the language which the parties used.

*Id*. at 661-62.[6] The court also held that because the condition under which the obligation was to continue was set out in the contract, there was no need to construe the agreement so as to import or imply a condition or date of termination other than that expressed by the parties themselves in the contract. *See also Payroll Express Corp. v. Aetna Casualty and Surety Company*, 659 F.2d 285, 291-92 (2d Cir. 1981) (applying *Warner-Lambert* and holding that an agreement that the policy would terminate upon the insured's failure to pay premiums, without establishing a set duration of the policy, made the policy cancelable only upon that circumstance and not terminable at will or after a reasonable time).

---

[6]The court emphasized that the event that would relieve the manufacturer of its obligation was directly related to the subject matter of the contract, not an extraneous event outside the control of the parties. *See also Ehrenworth v. George F. Stuhhmer & Co.*, 128 N.E. 108 (N.Y. 1920) (holding that an agreement to provide goods at a fixed low price was not terminable at will in the absence of an expressed termination date and remained in effect while both parties remained in business, in part because such a termination point bore a rational relationship to the subject matter of the contract).

Similarly, in *Foster-Porter Enterprises, Inc. v. DeMare*, 81 A.2d 325 (Md. Ct. App. 1951), the court held that the applicability of the contention that the contract at issue (an exclusive distributorship agreement) was terminable at will because it contained no provision for a definite term depended upon the construction of the contract. Interpreting the general rule regarding the absence of a duration provision as having exceptions, including where the contract is terminable for cause, the court noted that the contract at issue included a provision for termination upon the happening of any one of three specified events. Consequently, the court concluded,

> The only reasonable interpretation of [that provision] is that the contract continues in force until terminated for cause - - or at least continues for a reasonable time. Construction of the contract as terminable at will would defeat its purpose and would make [the termination provision] meaningless.

*Id.*, 81 A.2d at 333. *See also Pumphrey v. Pelton*, 245 A.2d 301, 303 (Md. Ct. App. 1968) (interpreting a contract for the exclusive use of Dairy Queen equipment and name that did not contain an explicit termination date but stated it would be for the time covered by the involved patents and copyrights so long as the restaurant operator performed its covenants under the contract was terminable only for cause, *i.e.*, one of the causes expressed in the contract.)

Thus, parties may contract for an indefinite term whose duration is defined by the conduct of the parties as set out in the conditions agreed to for continuation or termination. *See Zee Medical Distributor Association, Inc. v. Zee Medical, Inc.*, 94 Cal. Rptr.2d 829, 833 (Cal. Ct. App. 2000). Accordingly, contracts stating that the obligations would continue "as long as" or "so long as" a party fulfilled specified obligations have been found valid and enforceable. *Id.* (and cases cited therein). In that situation, the contract is not terminable at will but, instead, is terminable for the causes set out therein.

As *Warner-Lambert* indicates and *Zee Medical Distributor Association* makes clear, a contract without a specific durational term may fall within one of several categories, or, stated another way, courts may apply a three-step analysis to questions of the duration of a contract:

> The court first seeks an express term. If one is absent, the court determines whether one can be implied from the nature and circumstances of the contract. If neither an express nor an implied term can be found, the court will generally construe the contract as terminable at will.

*Zee Medical Distributor Association*, 94 Cal. Rptr.2d at 835, *citing Consolidated Theatres, Inc. v. Theatrical Stage Employees Union*, 447 P.2d 325 (Cal. 1968).

If the parties have not set a termination date or condition, the law may imply an agreement that the contract is to last for a reasonable time or is terminable only upon reasonable notice. Thus, in the absence of a controlling provision fixing the duration of a contract, courts will deem the contract to be terminable with a reasonable period of time. *United States Surgical Corporation v.*

13

*Oregon Medical & Surgical Specialties, Inc.*, 497 F. Supp. 68, (S.D.N.Y. 1980), citing *Warner-Lambert*, *supra*. What is reasonable is determined by the intent of the parties and all the circumstances of the case, including the course of conduct of the parties and their reasonable contemplation and expectation. *Id.*; *San Francisco Brewing Corp. v. Bowman*, 343 P.2d 1 (Cal. 1959) (considering an exclusive beer distributorship arrangement).

We find these principles persuasive and consistent with Tennessee law. Contracts without definite durational provisions have been considered by Tennessee courts, but usually in the context of an argument that such a contract is unenforceable because it lacks sufficient definiteness as to a material term. In the context of that argument, and recognizing that "the law leans against the destruction of contracts for uncertainty, especially where one of the parties has performed his part of the contract," this court has held that the duration of a contract need not be specified to make the contract enforceable. *Book-Mart of Florida, Inc. v. National Book Warehouse, Inc.*, 917 S.W.2d 691, 694 (Tenn. Ct. App. 1996); *APCO Amusement Company, Inc., v. Wilkins Family Restaurants of America, Inc.*, 673 S.W.2d 523, 528 (Tenn. Ct. App.1984). These cases establish that a contract that is silent as to duration is enforceable. *See also Parks v. Morris*, 914 S.W.2d 545, 549 (Tenn. Ct. App. 1995).

Because the Tennessee cases deal with the enforceability or validity of a contract without a specific durational term, their statements regarding the effect of this lack of specificity must be viewed from that perspective. For example, in support of its holding that a contract did exist in *APCO Amusement Company*, the court stated an agreement which contains no express provision as to its duration may be construed as being perpetual or terminable at will. 673 S.W.2d at 528. That statement was made to demonstrate that an unenforceable perpetuity was not the only result of the absence of a specific duration.

Such agreements have also been interpreted as providing for an indefinite term. *Minor*, 863 S.W.2d at 54.

> Where the parties have not clearly expressed the duration of the contract, or where the duration of the contract is indefinite, the courts will imply that they intended performance to continue for a reasonable time.

*Id.*, citing 17A AM. JUR.2d *Contracts* § 479 (1991).[7]

---

[7]     What constitutes a reasonable time within which an act is to be performed where a contract is silent upon the subject depends on the subject matter of the contract, the situation of the parties, their intention in what they contemplated at the time the contract was made, and the circumstances attending the performance.

*Minor* at 54 (quoting 17A AM.JUR.2D *Contracts* § 479 (1991)).

14

In *McReynolds v. Cherokee Insurance Co.,* 896 S.W.2d 777,779 (Tenn. Ct. App. 1994), this court acknowledged and applied *First Flight* and other authority holding that contracts for an indefinite duration are generally terminable at will by either party *with reasonable notice.* Reasonable notice of termination flows from and must be determined in accordance with the standards of good faith and fair dealing implied in every contract. The determination concerning what constitutes reasonable notice, however, is a fact specific inquiry dependent upon the length of the contractual relationship between the parties, the reliance which either party placed upon the continuing vitality of the contractual relationship, and the particular business involved.

Thus, Tennessee courts have found contracts with no specified duration to be either perpetual, terminable at will on reasonable notice, or terminable after a reasonable duration. These alternative results are consistent with Corbin and with the authority from other states discussed above. In none of the Tennessee cases discussed so far herein, has the court examined a contract where a termination for cause provision was included. In fact, the *Cherokee Insurance Co.* court specifically noted that the contract at issue in that case "did not include a statement of duration and did not incorporate any stipulations regarding termination." *Id.* at 778.

Like the court in *Warner-Lambert*, we think that is a significant and determinative difference that makes the rules regarding the absence of a durational provision inapplicable to the case before us. Where the parties have agreed that the duration of the contract will continue until specified circumstances exist, it cannot be said that the contract is silent as to duration. Even in those cases dealing with missing durational terms, the courts have invoked the cardinal rule of contract interpretation. Courts will, if possible, construe an agreement without a durational provision so as to effectuate the reasonable intention of the parties if that intention can be ascertained. *APCO Amusement Company*, 673 at 528. "The intention of the parties is, of course, the ultimate question to be decided on the construction of an agreement." *Cherokee Ins. Co.*, 896 S.W.2d at 780. Thus, where the intention of the parties as to the duration of the contract is clearly stated in the agreement, Tennessee courts will enforce that intention.

A Tennessee court has in one instance addressed an agreement without a specified duration but with language indicating the conditions under which it was to continue. In *Hamblen County v. City of Morristown,* 584 S.W.2d 673 (Tenn. Ct. App.1979) the Hamblen County Board of Education and the City of Morristown's Board of Education had entered into a written agreement calling for the construction of a new public high school and the renovation of an existing high school in order to alleviate school overcrowding. The County agreed to acquire the necessary land for the new high school and thereafter lease the land to the City "for such time and so long as the same is used for educational purposes for city and county students." *Id.* at 677.

This arrangement worked for eleven years, until the County filed suit to set aside the contract with the City and regain the right to operate the new school. One of the issues raised was that the contract was void because it was a perpetuity. On appeal, this court found that although the contract stated that the arrangement was "binding and irrevocable," it was not a perpetual contract. The court further held:

15

The intentions of the parties in entering into this contract are manifested within the language of the agreement. The agreement calls for extensive expenditures and long term commitments. Both parties needed protection from arbitrary rescission. This Court interprets irrevocable to mean that the contract could not be revoked at will by one of the parties over the objection of the other. (citation omitted). The contract is and was clearly revocable for material breach by either party or by mutual agreement.

*Id*.

Because the parties herein expressly made the duration of the contract co-extensive with QMT's competitiveness, this is not a contract that is silent as to duration. The intent of the parties is manifest in the language they used. They established causes for termination. To interpret the agreement as terminable at will would make the termination for cause provisions meaningless and ignore the clear intent of the parties. We conclude that the obligation of S&S to use QMT for all its heat treating business was not terminable at will by S&S, but was only terminable for one of the causes set forth in the agreement.

While we think the language of the contract is clear, we also note that nothing in the parties' dealings here indicates the exclusivity agreement was just an "at will" business relationship. Over the course of their dealings, the Johnsons have paid the Welchs significant amounts of money related to QMT. As part of the initial transaction to purchase QMT, the Johnsons paid the Welchs more than $186,000 for the assets of their heat treating business which largely were unique to servicing the parts of S&S. Similarly, Mr. Welch encouraged the Johnsons to move QMT from Hendersonville to Cookeville in order to be closer to S&S. Not only did the Johnsons move to Cookeville, they purchased real property from the Welchs for $280,000. The Johnsons borrowed money to finance these purchases. In view of the substantial investment and obligations the Johnsons undertook and because the success of QMT depended upon S&S's business, it is highly unlikely that the Johnsons would have left the continuation of that business to the whim of Mr. Welch.

Mr. Welch was well aware that when he sold QMT to the Johnsons that most of the heat treating work for QMT was provided by S&S. Before Mr. Welch sold QMT to the Johnsons, QMT had performed all of the heat treating work for S&S. Moreover, because of the nature of Mr. Welch's product line, substantial portions of the QMT heat treating equipment were uniquely tied to S&S's product line. He was well aware of the importance of S&S's business to QMT's continued viability and the Johnsons' opportunity to recoup their investment. Even Mr. Welch conceded at trial that the parties intended the agreement to continue indefinitely as long as the conditions were satisfied.

The trial court found that the parties considered the exclusivity agreement as a long term arrangement that was to continue as long as QMT's heat treating of S&S's parts was competitive in "price, delivery and quality." We agree. Consequently, S&S's defense of the breach of contract claim must be based on a failure of QMT to meet the conditions for continuation.

16

At trial, S&S and Mr. Welch took the position that S&S was permitted to terminate the contract for cause on two grounds. The first was that QMT was no longer competitive in quality because of the cracks discovered in some parts.[8] The trial court rejected S&S's arguments on this point and stated, "Reed Welch claimed that S&S would still be using QMT's services except for the fact that QMT had a quality problem and QMT did not certify its work. Neither of these assertions are accurate." The court also found:

> Until the contract was terminated in August 1999, S&S never complained to QMT that its heat treating was not competitive in price, delivery, or quality. Nor did S&S customers refuse to accept products heat treated by QMT, and that was before there was any alleged controversy which arose concerning the K233-509 parts. Also, well before any controversy arose, Reed Welch was attending auctions to purchase heat treating equipment in order to take back the heat treating process. The Defendants claim that they terminated the contract because QMT was not competitive in quality with respect to the K233-509 parts. That's simply not the case. S&S was not acting in good faith, and Jerald Welch had not read the contract until Mr. Johnson questioned the out-sourcing of the parts to Paulo Products. Reed Welch was looking for a way to get back into the heat treating business.

These facts led the court to conclude that S&S's motivation for terminating the contract was "suspect at the very minimum."[9] With regard to S&S's contention that QMT was not competitive in quality because of cracking problems, the evidence shows the following.

In the summer of 1999, a problem arose concerning S&S Part # K233-509, which is a shock absorber part and has safety implications. Mr. Biss noticed a crack in one of the lots and, consequently, recalled seven lots for further inspection of each part. A small number of these parts were determined to have cracks, but the majority were re-shipped to customers.

S&S notified QMT of the cracking, at least informally, sometime in June of 1999, because Mr. Johnson asked in a June 22 transmittal for two examples of the cracked parts. Accompanying this transmittal were various reports concerning QMT's heat treating process, including logs relating

---

[8]There was really no question regarding QMT's competitiveness as to price and delivery. Jerald Welch testified that S&S made no such contention, although he clarified that QMT's final demand for payment of outstanding balances before returning treated S&S products could be considered a problem with delivery. The trial court found that QMT did not raise its prices from those set out in the contract, and agreed therein to be competitive, and that S&S was paying its new heat treater more. The court also found that QMT always met delivery and turnaround deadlines.

[9]The Welchs also took the position that S&S was the sole arbiter of competitiveness of quality. The court found this interpretation of the contract unsupported by the evidence or the language of the document, and held that the Welchs' interpretation was "self-serving, revisionist, and totally incorrect."

to specific work orders. On July 6, Mr. Biss sent a request to Sherry Laboratories to test the parts to determine the cause of cracking, and the request indicated that quench cracking was suspected. Sherry Laboratories reported back on July 14, 1999, and concluded that the cracking was the result of quench cracking. Quench cracks occur during the heat treating process and can be caused by anything that produces excessive quenching stress, including part design, steel grades, part defects, and heat-treating and tempering practices.

The report noted that four samples had been submitted and that S&S had reported that the components were made from grade 4140 alloy steel. It also described the various tests performed. The report concluded by recommending that the heat treatment processes and records for the parts be reviewed, noting that particular attention should be paid to the quenching operation including review of the adequacy of the quench medium and suggesting that minimizing delay between quenching and subsequent tempering would be helpful.

On July 16, 1999, Mr. Biss sent a corrective action request to QMT recommending that QMT's processes/records be reviewed for appropriate action and forwarding the Sherry Laboratories report. Mr. Johnson replied within one week, as requested by S&S, with the results of a review of "Standard Practices for 4140 Material" as promulgated by the American Society for Metals, and stated that all QMT records and processes were in compliance with those industry standards. He also notified S&S that an independent study had been completed by Metallurgical Technologies, Inc. and the result indicated that the root problem may be in the material.

The July 22, 1999 report from Metallurgical Technologies, Inc. indicated that company had reviewed the Sherry Laboratories report. In fact, the Metallurgical Technologies report interpreted some of the findings by Sherry Labs. For example, it noted that although Sherry Labs indicated the cracking was probably quench cracking, "no attempt has been made to determined why the part quench cracked." It further noted that many of the observations made by Sherry Labs were consistent with imperfections existing in the hex bar material prior to its fabrication into the parts and prior to the heat treating. The report questioned whether more in depth or follow up testing and examinations had been performed because such tests could have revealed the real problem. Mr. Biss interpreted this report as indicating that material cleanliness could have been the problem.

The report concluded with recommendations to verify the cracking and determine its cause, including performing a chemical analysis to determine what alloy was involved and to determine its impurity contents. It also recommended that the heavy oxide scale on the part be removed to verify intergranular cracking and to look for indications of a seam that may have initiated the cracking. Other steps were recommended to identify signs of the cause of the cracking.

Mr. Biss, Jerald Welch, and Mr. Johnson met on July 23 regarding the cracking issue, and Mr. Johnson confirmed the results of that meeting in a letter. The men agreed to solicit two third party independent studies on the cause of the quench cracking. Mr. Johnson outlined his suggestions for "common criteria" to be provided to the two laboratories. Included in that list was information

18

regarding the historical quench crack percentage produced by other heat treating suppliers, including QMT before and after the Johnsons' purchase of it.

Mr. Biss sent a request to Sherry Laboratories on July 28 for the cost of further review and testing and a copy of the Metallurgical Technologies report. Apparently Mr. Johnson sent a similar request to Metallurgical Technologies, and they provided a report on August 10 that was sent to Mr. Johnson, Mr. Biss, and the Welchs. After an analysis of the cracks, the report concluded:

> The heat-treated parts are quench cracking due to a combination of material deficiencies, alloy selection and design. The quench cracked parts exhibit surface laps/seams, a high concentration of significant stringer inclusions, and significant surface decarburization, all of which contribute to quench cracking.

The report made several recommendations to prevent the cracking, including obtaining a better quality of steel and a design change. It also recommended changes in the quenching part of the heat treating process, but noted that those changes could be a costly alternative.

This was the last report received by S&S prior to its discontinuing sending its parts to QMT for heat treating. Although Mr. Johnson shared this report with S&S, neither the Welchs nor Mr. Biss ever contacted Metallurgical Technologies to discuss its findings.

S&S relies on testimony from Mr. Biss and Jerald Welch that S&S did its own test by sending parts from the same supplier to QMT and to another heat treater and compared the results, finding that the QMT processed parts had some cracks while the others did not. The record is not clear as to when this "test" occurred, and Jerald Welch could not remember the timing. During cross-examination, Jerald Welch acknowledged that S&S's steel supplier had changed sources of steel three times during the summer of 1999 when the cracks appeared.

At trial, Mr. Samuel Pendergrass, owner of Metallurgical Technologies and an engineer with a degree in physical metallurgy testified regarding the extensive tests his company had performed on the parts at issue. He explained that his company removed the oxide scale on the cracks, something Sherry Labs had not done, in order to see the features of the cracks which provide information about how, when, and why the crack occurred. He testified that not removing the oxide would make it very difficult to resolve the cause of the cracking.

Mr. Pendergrass discovered several laps in the open crack surfaces, which is "a defect in the material caused during the rolling of the bar stock where, as the material is rolled through bars to shape it and form it and reduce the cross-section, some of the surface folds over and gets rolled in." The tests also showed that a surface layer, or near-surface layer, in the material was softer than the rest, due to decarburization. He also found there were a relatively high number of non-metallic stringer inclusions, which are impurities or foreign particles in the metal left in the steel from the original manufacturing process.

19

Mr. Pendergrass also testified that he reviewed QMT's processes and industry standards and found nothing in the heat treatment that was contributing to the cracking problem. Pointing out that unless a product is heat treated, including being subjected to quenching, there would be no quench cracking, he stated, "when you have all of these other factors involved, really the problem lies in the design, selection of material, and the material deficiencies. Without these other problems there should not have been any cracking."[10]

Almost a month after S&S decided to send its heat treating business elsewhere, S&S received another report from Sherry Laboratories, dated September 23, 1999. That report responded to the Metallurgical Technologies report, and Mr. Voss, the author of the report, stated he agreed with the recommendations made by Metallurgical Technologies. The Sherry Labs report concluded, "the root cause of cracking appeared to be the design of the part, as suggested by Metallurgical Technologies, Inc., PA, and/or the heat treating practice." The report suggested that a review of the history of frequency of cracking of the component part at issue would help clarify whether cracking has historically been a problem with the design.

Mr. Voss testified by deposition at the trial. He stated that the purpose of some of the recommendations in his first report was to get S&S to review the heat treating process, particularly the quenching operation. He stated there was no more communication from S&S until the report from Metallurgical Technologies was sent to him. He disagreed with Metallurgical Technologies' conclusions about decarburization to some extent, and concluded that the heat treating process could have aggravated the decarburization process already existing in the raw material. He concluded that the cracking did not appear to be related to a material defect. He reaffirmed his report's conclusion that the cracking could have been caused by either design of the part or by heat treating practice. He acknowledged that in his examination of the parts, he found nothing that would indicate that QMT had varied from industry standards in any way.

Since S&S has been sending its heat treating work to Carolina Commercial Heat Treating, there have been occasional cracking problems also. Mr. Biss testified that he never made a recommendation to S&S management that it cease its relationship with QMT because of quality concerns.

The trial court found persuasive the testimony of the metallurgy experts. The court specifically found:

> The Defendants indicate that since the crack in some of the parts appeared during the quenching that QMT was not competitive in quality. The Court finds that the crack was not caused by a defective heat treating process. QMT had treated these same

---

[10]He also testified that he thought the largest factor contributing to the cracking was the design of the part and that if the part in question is made with commercial quality 4140 steel, there is going to be cracking on a small percentage of the parts. The original report had recommended using 8640 grade material as a way to lower the potential for cracking. S&S presented evidence that the material it used, in the 4140 range, met industry standards. Of course, meeting industry standards does not mean that no cracking will occur.

parts for almost six years without incident. QMT had treated thousands of these parts. Sam Pendergrass is a credible and qualified metallurgical expert. He indicated and verified that the most likely cause of the problem with this part arose from the material alloy used in making the part, not from any defect in the heat treating process.

The laboratory which the Defendants selected to test these parts, Sherry Laboratories, never told them that the heat treating process by QMT was defective. To the contrary, they indicated that the examination of the part did not indicate that QMT had varied from the accepted heat treating industry standards in any way during its heat treating of these products.

The evidence does not preponderate against these findings. The proof at trial clearly supports the trial court's finding that S&S had no ground under the terms of the contract to terminate the long standing agreement with QMT over quality concerns.

The second ground asserted by S&S as justifying termination of the agreement is its allegation that QMT improperly altered the terms of the agreement. Although Mr. Reed Welch testified that QMT would still be doing the heat treating work except for the quality concerns, Mr. Jerald Welch testified that "the root of the problem" leading him to stop doing business with QMT was that Mr. Johnson was not going to give treated parts back to S&S until S&S paid everything that was owed to QMT. Some factual background is necessary.

Jerald Welch testified that he became angry or frustrated with Mr. Johnson for "not accepting responsibility" for the cracking problems. Mr. Bliss pointed out to him the limitations of liability and limited warranty provisions contained in QMT's invoices. As a result, on August 26, 1999, Jerald Welch wrote Mr. Johnson a memorandum directing QMT to remove the terms of its limited warranty and limitation of remedies from all its invoices.[11] The memorandum also stated, "S&S will as of August 26, 1999 no longer accept invoices with this document attached." Mr. Welch ended

---

[11] There were other disputes going on at this time, and other correspondence leading up to the August 26 letter demonstrate that tensions were heating up. On August 16, 1999, Jerald Welch wrote Mr. Johnson regarding an issue with the specifications for a new (or in Mr. Johnson's view, not a new) part. Mr. Welch characterized QMT's actions as gross negligence and stated that S&S now required QMT to review its product/process implementation procedures and submit them to Mr. Biss. Mr. Johnson responded by letter date August 23, disputing the claims made by Mr. Welch and informing him of his numerous contacts with Mr. Biss, specifically including questions regarding specifications for the part at issue as well as a long list of other issues brought to Mr. Biss's attention. He also stated that the process procedures requested by Mr. Welch were proprietary documents and the common industry practice was not to share them. However, he stated that QMT had provided its Quality Control Manual and routinely provided certifications that met S&S's requirements. The letter also stated that QMT was performing to its contractual requirements, and that, "what you are proposing is a 'new contract.'" Mr. Johnson stated QMT intended to continue to abide by the terms of the existing contract and expected S&S to do the same. There was also correspondence disputing who was responsible for paying Sherry Laboratories for the testing. In particular, Mr. Johnson declined to pay an invoice for the testing ordered by S&S before S&S informed QMT of the cracking problems.

his memorandum with the following: "You either want to be in the commercial heat treating business and are willing to stand behind your work or you don't, which is it?"

The terms found so offensive to Mr. Welch had been used by QMT when Jerald Welch's father, Reed Welch, owned the business. Moreover, the Johnsons had used the terms on invoices the entire time they had owned QMT and dealt with S& S. At trial, Jerald Welch admitted that he did not conduct any investigation of industry practice concerning warranties or limitations of remedies before sending the letter and that in fact had subsequently learned that such terms are "standard" in the heat treating business. A copy of the warranty and liability terms used by the successor heat treater for S&S, Carolina Commercial, was introduced into evidence. Although Jerald Welch stated that Carolina Commercial personnel had assured him that such limitations seldom are upheld, he was unable to point out any specific portion of the limitations provisions that S&S found more favorable than those on QMT's invoices.

In a letter dated August, 30, 1999, Mr. Johnson replied to Jerald Welch's memorandum as follows:

> While it is our position that you have irretrievably broken the contract between S&S Screw Machine, Co., Inc. and QMT Quality Metal Treating, Inc., we will continue to be willing to process your purchase orders as needed by you as to all you to meet the demands of your customers. The terms for such work will be stated on our invoicing, a copy of which is attached to my letter to you of August 24, . . .

By another letter dated August 30, 1999, Mr. Johnson stated:

> It is clear to us, in light of your letter dated August 26, 1999, and your recent shipment to Carolina Commercial Heat Treating, that you do not intend to perform under our contract in good faith. Accordingly, we must be paid in full with certified funds before we will deliver the remaining orders to you. Attached in the balance due.

Mr. Jerald Welch replied to Mr. Johnson's August 30 letter (although it is not clear which one or both) denying S&S had breached the contract. Some reference is made to S&S's "right to seek out competitive suppliers," apparently in explanation of the claim that S&S had sent heat treating business to someone other than QMT. At trial, he took the position that S&S had sent some parts for heat treating to Carolina Commercial as a test related to the cracking problem.

This correspondence began with a statement that "it is clear that you have no intention to stand behind your work and that you are unable or unwilling to even attempt to meet our requirements for quality." Consequently, the memorandum continued, S&S "accepted" that QMT recognized it had failed to meet the requirements of the agreement between the companies. Mr. Welch continued, "Under no circumstances will QMT attempt to hold any S&S product hostage" and that it would pay all balances in the normal manner. Mr. Welch indicated that S&S "would

consider keeping QMT as a supplier" if it met its requirements "in total" and that he would pick up any S&S products at QMT by September 1, 1999.

On August 31, Reed and Jerald Welch delivered a check to QMT for the full amount owed less $7,248.80, which the Welchs claimed as expenses they incurred related to a rust problem and the cracking problem. When he returned to his office, Jerald Welch read Mr. Johnson's letter stating that QMT required full payment of outstanding balances with a certified check and interpreted that as holding S&S parts hostage. Jerald Welch stated that S&S had never paid QMT with a certified check before and was never required to do so and that he believed S&S's payment was due 30 days after invoicing and some of the amounts demanded by QMT were for work invoiced less than 30 days before. He immediately ordered that S&S parts be removed from a QMT truck on which they had been loaded for transport to QMT for heat treating. He refused to let those parts go to QMT and never sent any more parts to QMT for heat treating.

After recounting the history of the correspondence between the parties, and noting that the objectionable terms regarding warranties and limitations of liability were not new terms and were standard in the industry, the court found:

> In response to S&S's decision to seek other heat treaters and refusal to accept QMT's invoices, Mr. Johnson told S&S that QMT expected to be paid C.O.D. for its heat treating work as it was performed. At that point, Jerald Welch confirmed that he became increasingly angry with Mr. Johnson and he pulled S&S work from QMT. S&S failed to provide notice to QMT had of the termination of this long-term contract.

The trial court found that S&S breached the contract. Thus, the trial court rejected S&S's argument that QMT altered the terms of their agreement. The evidence shows that S&S actually altered the parties agreement first by refusing to pay under the longstanding terms and demanding those terms be removed from QMT's invoices as a condition of continued business. Further, the facts reveal that S&S gave QMT no alternative but to require cash on delivery payments given S&S's improper outsourcing, slow paying of past due invoices, claims of poor quality and contentious letters from Jerald Welch essentially daring QMT to break off their longstanding business relationship.

It is clear that Mr. Johnson did nothing to give S&S cause to terminate the agreement due to the payment term put in place in late August, 1999, in the context of the correspondence and conduct preceding it. Accordingly, we affirm the trial court's conclusion that S&S had no cause to terminate the exclusivity agreement and, consequently, breached it.

### IV. Lost Profits

Having found S&S breached the exclusivity agreement, we turn to the Johnsons's claim for lost profits. The trial court awarded the Johnsons $821,689 in lost profits.

Compensatory damages are intended to compensate the wronged party for the loss or injury caused by the wrongdoer's conduct. *Beaty*, 15 S.W.3d at 828-29. The purpose of damages in a breach of contract case is to place the injured party, as nearly as possible, in the same position it would have been in had the contract been performed. *LaMons v. Chamberlain*, 909 S.W.2d 795, 801 (Tenn. Ct. App. 1993); *Hennessee v. Wood Group Enters., Inc.,* 816 S.W.2d 35, 37 (Tenn. Ct. App.1991); *Wilhite v. Brownsville Concrete Co.,* 798 S.W.2d 772, 775 (Tenn. Ct. App.1990). Damages ordinarily protect the injured party's expectation interests by awarding the party the benefit of its bargain. RESTATEMENT (SECOND) OF CONTRACTS § 344(a) & cmt. a (1979). The most common method for awarding expectation damages is to award the injured party the profits it would have made had the contract been completed. *Inland Equip. Co. v. Tennessee Foundry & Mach. Co.,* 192 Tenn. 548, 556, 241 S.W.2d 564, 567 (1951); *McClain v. Kimbrough Construction Company,* 806 S.W.2d 194, 200 (Tenn. Ct. App. 1991); *Morristown Lincoln-Mercury, Inc. v. Roy N. Lotspeich Publishing Co.,* 42 Tenn.App. 92, 103, 298 S.W.2d 788, 793 (1956).

S&S and the Welchs do not dispute that lost profits are the appropriate measure of damages. Instead, they argue that the calculations used resulted in an award of damages greater than the Johnsons' probable loss and did not provide a reasonable estimate of damages. Thus, the Welchs challenge the amount of damages, and such determinations are questions of fact. Consequently,

> In cases where the trial court is hearing the case without a jury, we review the amount of damages awarded by the trial court with the presumption that it is correct, and we will alter the amount of damages only when the trial court has adopted the wrong measure of damages or when the evidence preponderates against the amount of damages awarded.

*Beaty*, 15 S.W.3d at 829.

As a starting point, the courts will not award uncertain, contingent, or speculative damages. *Nashland Assocs. v. Shumate,* 730 S.W.2d 332, 334 (Tenn. Ct. App.1987); *Moore Constru. Co. v. Clarksville Dept. of Elec.*, 707 S.W.2d 1, 15 (Tenn. Ct. App. 1985). Thus, damages based on lost or expected profits must be proved with reasonable certainty. *McLain,* 806 S.W.2d at 200; *Moore,* 707 S.W.2d at 15; *American Bldgs. Co. v. DBH Attachments, Inc.,* 676 S.W.2d 558, 562 (Tenn. Ct. App.1984). The reasonable certainty requirement does not require mathematical precision, *McLain*, 806 S.W.2d at 200; *Airline Constr., Inc. v. Barr,* 807 S.W.2d 247, 274 (Tenn. Ct. App.1990), but rather sufficient proof to enable the trier of fact to make a fair and reasonable assessment of the damages. *Pinson & Assocs. Ins. Agency, Inc.*, 800 S.W.2d at 488.

The evidence regarding damages and lost profits came primarily from Mr. Johnson and from

24

Ronald Clouse, a C.P.A. who had been QMT's independent accountant since 1995. He explained that he was involved in preparing the company's financial statements, doing tax returns, and consulting. Mr. Clouse stated that he was asked to determine the means of placing QMT back into the same position it was in prior to the termination of the S&S contract. Regarding the methodology used to calculate this, Mr. Clouse explained that he determined the net profits that would have been realized had the contracts been continued.[12] To reach his conclusion, Mr. Clouse explained that he considered the company's financial statements and operations.

Mr. Clouse testified that the amount of work that would have come to QMT if the contract had not been breached was readily ascertainable from the heat treating statements of Carolina Commercial Heat Treating, the company that had replaced QMT for S&S's heat treating needs. Mr. Clouse used those statements from September 1999 through trial. The trial court found:

> The amount of heat treating work that was generated by S&S that otherwise would have been sent to QMT is known to have been sent to Carolina Commercial Heat Treating. The actual amounts of revenue and probable net profit lost by QMT is reasonably certain, and the purchase orders of Carolina Commercial Heat Treating for the first twenty-five (25) months after the contract was terminated were used to calculate the loss of revenue and loss of net profit to QMT.

We agree with the trial court that the work done by Carolina Commercial provides a reasonable basis for determination of the revenues QMT lost when S&S took its business elsewhere. S&S and the Welchs do not argue otherwise.[13] Their argument goes to the determination of profits, not revenues. They argue that the trial court's award of lost profits was in error because the calculation disregarded the profit history of QMT and improperly allocated operating costs among QMT's customers with the effect of understating costs of treating S&S's products and overstating profit from S&S business.

In awarding the Johnsons four years of lost profits,[14] the trial court found:

---

[12]Mr. Clouse opined that "basically QMT had no marketability after the contract was lost," so using a methodology to determine the value of the business before and after the breach was not appropriate.

[13]At trial there was some testimony that S&S's business had declined recently and that it was not sending as much work to Carolina Commercial as it had earlier. That argument is not pursued on appeal.

[14]The Johnsons had requested lost profits for fifteen years to parallel the financing terms the Johnsons had entered into to purchase the Cookeville property. During cross-examination, S&S's expert accountant, Steven Riley, explained that according to accounting litigation support guidelines, three years from the breach is the preferred period of time. The trial court determined that four years was "a reasonable time under the facts and circumstances of this contract and it is the time that would be appropriate." On appeal, S&S and the Welchs do not challenge the court's choice of four years.

A CPA, Mr. Clouse testified he's familiar with the books of QMT from 1995 to the present, and he testified that the net profit lost to QMT as a result of the loss of this contract for the first twenty-five (25) months was $ 427,963.

By extrapolating the twenty-five month loss over four years, the court arrived at the figure of $821,689.

Mr. Clouse did assign a smaller than average percentage of operating costs to S&S's work. There was evidence as to the justification, and based on that evidence, the trial court found:

> This company has struggled financially since its contract for exclusivity of the heat treating process where the agreement provided for the Plaintiff to process all of the S&S Screw Machine Company parts was terminated. When the contract was terminated by S&S on August 31st of 1999, QMT lost the majority of its heat treating process or its heat treating business. At that time, approximately 50 to 60 percent of QMT's revenues were generated by heat treating S&S parts, and it's been impossible for QMT to replace the revenues that were lost as a result of S&S terminating and breaching that contract. QMT has had difficulty replacing these revenues because the type of equipment that was purchased from Reed and Olive Welch is unique and is fashioned to heat treat machine parts manufactured by S&S. This particular type of process requires - - or doesn't require but utilizes batch furnaces that are designed for heat treating parts and they require medium to deep case work. This type of process is unique to parts that are manufactured by S&S. The use of such equipment would not be easily transferred to other companies because QMT is not in a position to profitably compete with belt furnaces that are used by other heat treaters.

S&S heat treating work was QMT's most profitable process. Mr. Clouse explained that because of the nature of the heat treating process and design of the "batch furnaces," fixed and variable expenses could not be adjusted proportionally to reflect the loss of sales and revenue. Mr. Johnson testified that when S&S pulled its work, the "batch furnaces" still had to run 24 hours a day even though QMT had lost the work. Mr. Johnson had explained that the "batch furnace" ran continuously for 24-hours a day, and the deep case heat treatment of S&S products took over eight (8) hours per cycle. Typically, the S&S work would be placed into the furnace at 10:00 p.m. on the second shift, and removed at 6:00 a.m. on the first shift. Thus, S&S parts could be heat treated on the third shift after midnight without QMT incurring any additional labor or natural gas expense. Eighty-five to ninety percent of the S&S sales volume was performed during this unmanned third shift.

When asked about the effect of S&S terminating its agreement with QMT, Mr. Clouse stated that the impact was "devastating . . ." Another accountant, Steven Riley, testified on behalf of S&S. He did not dispute there was an adverse consequence to QMT, but questioned some of the methodology used by Mr. Clouse. The trial court was not bound to accept any particular witness's testimony concerning damages. *Beaty*, 15 S.W.3d at 829.

26

The trial court chose the proper measure of damages, *i.e.* the net profits QMT would have made had S&S not breached the contract and removed its heat treating business. The actual amounts of revenue and probable net profits lost by QMT were proved with reasonable certainty. The evidence does not preponderate against the findings of the trial court as to the amount of lost profits.

## V. THE RELOCATION OF QMT

As set out earlier, both the QMT sales agreement and the contemporaneous lease with option to purchase the Welchs' Cookeville property envisioned the move of QMT from Hendersonville to Cookeville upon the expiration of the Hendersonville lease in February of 1997. Those agreements required that Mr. Welch (or Mr. and Mrs. Welch) assist in the relocation, installation and start up of QMT equipment. This obligation was described in several more specific provisions, including "the responsibility to relocate, install and start-up all the office and industrial assets being purchased, utilizing S&S Screw Machines, maintenance personnel and equipment."

The trial court found that while S&S used its employees to help move the equipment, they delivered the equipment but did little else to install or start up the heat treating furnaces and other equipment. The court also found S&S employees damaged the furnaces in transit making them inoperable and that S&S and Mr. Welch never repaired the equipment. The court found that it was May of 1997 before Mr. Johnson was able to use any of the equipment; that he had to hire third parties to repair, install and start up the equipment; and that he incurred additional expenses due to the problems in the relocation. The court held that S&S and the Welchs did not fulfill their obligations under the agreements and awarded the Johnsons damages resulting from that breach.

On appeal, the Welchs make several arguments. First, they claim they were only required to assist in the relocation and that they did assist. They argue that the provisions of the agreements regarding the relocation of QMT are inconsistent and, therefore, the first provision (with the general obligation to assist) must prevail over the second (spelling out the work to be done by the Welchs). They also argue the ambiguity created by the inconsistency should be construed against the drafter, the Johnsons through their attorney.

We disagree that there is any inconsistency or ambiguity in the agreement. The Welchs' agreement to "prepare the real property" in Cookeville is specifically defined to include the "responsibility to relocate, install and start up" the equipment. The obligations of the agreement are clear.

Second, the Welchs argue that no liability should attach to them because the Johnsons failed to perform the precondition of preparing a layout of the placement of the equipment. While they state that Mr. Johnson was unable to produce a layout at trial, it is significant they do not assert that no layout was ever made. Mr. Johnson testified he provided a layout to S&S. Mr. Newman, S&S's employee, testified Mr. Johnson laid out where the machines were to be located. Further, the Welchs showed no connection between the absence of a layout and the failure to install and startup the

equipment. They do not address the failure to repair the equipment their employees damaged in the move.

We find the Welchs' arguments regarding interpretation of the contract lacking in merit. The trial court correctly identified the obligations under the agreement, and the evidence supports the trial court's finding the Welchs breached the agreement.

The Welchs also challenge the trial court's award of damages as excessive. The trial court adopted the Johnsons' claim for damages, and that claim included expenses for repair of the damaged equipment and installation of the equipment. In addition, Mr. Johnson testified that he was forced to outsource heat treating for customers, primarily S&S, while the QMT equipment remained inoperable. The court awarded $65,312.68, plus prejudgment interest, as damages for the Welchs' failure to fulfill their responsibilities under the agreement and as a result of the damage to the equipment caused by S&S employees.

The Welchs argue that the contract required that the relocation and installation be completed within three months and that, therefore, the court erred in awarding damages for expenses incurred after February 1997. This argument disregards the Welchs' obligations in the relocation. They were responsible for installation, and it was S&S employees who damaged the equipment rendering it inoperable. Thus, delay was attributable to them.

Mr. Johnson testified as to the expenses incurred and introduced invoices documenting those expenses. No contrary evidence was introduced and no real challenge was made at trial to the validity of those expenses or their connection to the relocation. The evidence supports the damages awarded by the trial court.

## VI. QMT's Unpaid Invoices

S&S next argues that the trial court erred in awarding QMT damages for unpaid invoices in the amount of $7,248.80, plus prejudgment interest of $1,788.06, for a total of $9,036.86, because S&S claimed a setoff.

At the time S&S pulled work from QMT, S&S owed QMT an amount for heat treating work previously performed. S&S paid that amount minus $7,248. S&S presented a document reflecting expenses allegedly incurred by S&S related to rust and cracking problems during the spring and summer of 1999 which S&S calculated as totaling $7,248.

The trial court found that S&S's claim for a deduction was not appropriate and not supported by the facts of the case. With regard to the rust problem, the court found:

> About mid-June to mid-July of 1999, there was a controversy that arose between
> QMT and S&S that involved a part known as K233-509. . . . QMT had been heat
> treating these parts for S&S almost six years and had never had any problem with the

28

part. There was an issue of some type of rusty color with the product, but that issue seemed to go away. Mr. Biss concluded that the heat treating process did not cause the rust, and rather that it was a material problem with the part.

The evidence supports these findings. Even Mr. Biss, who came up with the list of expenses claimed as setoff, did not attribute the rust to the heat treating process.

With regard to the cracking problem, which S&S also relied upon to justify termination of the contract with QMT, the court, as discussed *infra* at III. B., found that the evidence did not support a conclusion that QMT's heat treating process caused the cracks. Consequently, the Welchs did not prove that they were entitled to reimbursement by QMT of expenses related to identifying and curing those problems. The trial court found S&S owed the monies to QMT and properly awarded QMT damages for the unpaid work performed, plus prejudgment interest.

## VII. PARTIAL REBATE OF PURCHASE PRICE OF QMT

The trial court also awarded the Johnsons a partial rebate of the purchase price they paid for QMT based upon Mr. Welch's failure to disclose to the Johnsons during their negotiations that a substantial amount of heat treating work would be lost to QMT because S&S was soon to lose some parts for a significant customer, Paccar. The amount of that rebate was set at $74,400, which represented 40% of the purchase price, based on testimony that the Paccar parts constituted 40% of S&S's heat treating business done by QMT. In regard to this claim, the trial court found:

> The Plaintiffs requested and Mr. Reed Welch identified a list of the various parts that were to be produced by S&S and which could be expected to be heat treated by QMT. Reed Welch agreed that he would provide an accurate account of those parts. However, S&S stopped manufacturing Part Numbers 5296, and 6262, and K179-378 soon after Mr. Welch sold the heat treating business to Mr. Johnson. Very soon after buying the business, the Plaintiffs almost immediately lost a substantial portion of the revenue that was expected from the heat treating of these parts. Reed Welch was aware of the likely loss of this business before he sold the heat treating business to the Johnsons. Mr. Welch knew that S&S was likely to cease production of these parts. He indicated and claimed that he had discussed this subject with Mr. Johnson before Mr. Johnson purchased QMT. This is simply not accurate and not the truth. Mr. Johnson would not have paid the same amount of money for this business if he had known that it was going to lose 40 percent of the revenue stream almost instantly after he had purchased the business from Mr. Welch. The revenue generated by these three parts identified by Reed Welch as probable sources of future revenue for QMT were also identified by Mr. Johnson on his Pro Forma Statements that were presented to lending institutions when Mr. Johnson sought financing to buy QMT from Mr. Welch.

The Plaintiffs are requesting the Court to rebate 40 percent of the contract price, which would be $74,400.00. . . . That is the amount of damage in regard to this particular agreement because of Mr. Welch's failure to provide this information at the time that Mr. and Mrs. Johnson purchased the business.

S&S argues that the trial court erred in awarding the Johnsons this partial rebate of the purchase price of QMT because this claim was time barred. S&S argued below and before this court that the three year statute of limitations for tort claims applied as opposed to the six year statute of limitations for contract actions.

The question is which statute of limitations applies to the Johnsons' claim: the three-year limitation applicable to actions for injuries to personal or real property in Tenn. Code Ann. § 28-3-105(1) or the six year limitation generally applicable to actions on contracts in Tenn. Code Ann. § 28-3-109(c)(3).

The parties' designation of the claim as tort or contract does not determine which statute applies. Instead, it is the gravamen, or real purpose, of the action that determines which statute of limitations applies. *Pera v. Kroger*, 674 S.W.2d 715, 719 (Tenn. 1984); *Tip's Package Store, Inc. v. Commercial Insurance Managers, Inc.*, 86 S.W.3d 543, 551 (Tenn. Ct. App. 2002); *Keller v. Colgems - EMI Music, Inc.*, 924 S.W.2d 357, 359 (Tenn. Ct. App. 1996),

[R]egardless of whether the suit is based on tort or on contract, the Court must look to the plaintiff's declaration to see whether or not he is suing for damages arising out of a contract or for damages arising out of tort . . .

*Keller*, 924 S.W.2d at 360, quoting *Harvest Corporation v. Ernst & Whinney*, 610 S.W.2d 727, 729 (Tenn. Ct. App. 1980), quoting *Bland v. Smith*, 277 S.W.2d 377, 380 (Tenn. 1955).

The Johnsons alleged that Mr. Welch knew that S&S would likely lose the contract to manufacture the three Paccar parts when he provided to the Johnsons the list of parts that QMT could expect to receive from S&S for heat treating. Essentially, they assert that Mr. Welch's failure to disclose this fact, or his misrepresentation of the volume of business to be expected, induced them to pay more for QMT than they would have if they had known about the likely loss. This is a claim for fraudulent misrepresentation. *See Justice v. Anderson County*, 955 S.W.2d 613, 616-17 (Tenn. Ct. App. 1997); *Simmons v. Evans*, 185 Tenn. 282, 285-86, 206 S.W.2d 295-96 (1947).

A person who is induced by fraudulent misrepresentation to enter into a contract may choose between two remedies: (1) treat the contract as voidable and sue for rescission, or (2) treat the contract as existing and sue for damages under the theory of fraudulent inducement or deceit. *Vance v. Shulder*, 547 S.W.2d 927, 931 (Tenn. 1977); *Justice*, 955 S.W.2d at 616. The Johnsons have chosen the second remedy, and that claim is grounded in tort. *Vance*, 547 S.W.2d at 931, (holding that a claim for damages resulting from misrepresentations that induced plaintiff to sell his stock at a lower than reasonable price was a tort claim); *Harvest Corporation*, 610 S.W.2d 727, 730 (Tenn.

Ct. App. 1980). This is a claim for economic loss attributable to misrepresentation in inducement to contract. The Johnsons' claim does not rest on an alleged breach of any term of the QMT sales contract; instead, it rests on alleged conduct by Mr. Welch occurring prior to the execution of the contract.

In determining the gravamen or nature of the cause of action, courts must look to the act that created the damages sought, regardless of whether a contract existed between the parties. *Keller*, 924 S.W.2d at 361; *Harvest Corporation*, 610 S.W.2d at 731. The Johnsons' claim is for injury to their property resulting from a misrepresentation that induced them to enter into the contract at the purchase price therein. That claim is a tort claim subject to the three-year statute of limitations of Tenn. Code Ann. § 28-3-105(1).

The Johnsons filed this lawsuit on September 23, 1999. The QMT sales contract was signed in October of 1993, and S&S lost the three Paccar parts in March of 1994. No claim for misrepresentation was raised within the three-year statute of limitations and is therefore time-barred. Accordingly, we reverse the trial court's award of a 40% rebate of the purchase price to the Johnsons.[15]

## VIII. THE JOHNSONS' PERSONAL RELOCATION EXPENSES

The trial court awarded Mr. Johnson $17,290.67 plus prejudgment interest as damages for S&S's failure to pay its share of relocation and temporary living expenses as provided in the employment agreement between S&S and Mr. Johnson. The court found that the failure to pay such expenses was a breach of the employment agreement. The agreement required S&S to pay all temporary living expenses and to share in moving and related expenses. The trial court found that sharing meant sharing equally. Mr. Welch does not dispute the interpretation.

Instead, on appeal, Mr. Welch asserts that Mr. Johnson's final request for reimbursement of expenses totaled only $6,464.00 and that S&S paid Mr. Johnson $5,000, so the maximum liability could only be $1,464.00. That argument overlooks the fact that two types of relocation expenses were included in the agreement. While Mr. Johnson claimed only $6,464.60 in temporary living expenses, he also claimed $31,652.14 in moving-related expenses. He requested half of the moving expenses ($15,826.07) and all of the temporary living expenses ($6,464.60), with credit for the $5,000 he had been reimbursed. The trial court accepted the claims and awarded Mr. Johnson $17,290.67.

The trial court found that the $5,000 paid by Mr. Welch was "completely arbitrary," without any basis, and did not comply with the parties' agreement. The court recounted that Mr. Welch indicated $5,000 was plenty because he had moved from California to Tennessee in 1971 for less than $5,000.

---

[15]In view of this holding, we need not reach Mr. Welch's arguments that the evidence does not support a finding of misrepresentation.

On appeal, Mr. Welch does not dispute any of the specific items claimed by Mr. Johnson. His only argument is that the trial court erred by awarding Mr. Johnson expenses greater than those he had requested from S&S and Mr. Welch. The trial court found that Mr. Johnson had protested the payment of only $5,000, "but he was not in a position to do much else other than to protest" since his family had relocated to Tennessee, he was employed by S&S, and, by the time the $5,000 payment was made, he and his wife had bought QMT and borrowed money to finance that purchase.

The evidence does not preponderate against the trial court's determination of damages. We affirm the judgment for breach of the employment agreement.

## IX. CONCLUSION

We affirm the trial court's judgments on all claims except the partial rebate claim, which we reverse, and remand the case for any further proceedings which may be necessary. Costs of the appeal are taxed to the appellants, Reed Welch, Olive Welch, and S&S Screw Machine Co., Inc.

_____
PATRICIA J. COTTRELL, JUDGE